## UNITED STATES *v.* JONES, Administrator, and Others.

IN ERROR TO THE SUPREME COURT OF THE STATE OF WISCONSIN.

Submitted October 11th, 1883.—Decided December 10th, 1883.

*Conflict of Laws—Constitutional Law—Damages—Eminent Domain—State Courts.*

1. The power to take private property for public uses, in the exercise of the right of eminent domain, is an incident of sovereignty, belonging to every independent government, and requiring no constitutional recognition, and it exists in the government of the United States. *Boom* v. *Patterson,* 98 U. S. 406, cited and approved.

2. The liability to make compensation for private property taken for public uses is a constitutional limitation of the right of eminent domain. As this limitation forms no part of the power to take private property for public uses, the government of the United States may delegate to a tribunal created under the laws of a State, the power to fix and determine the amount of compensation to be paid by the United States for private property taken by them in the exercise of their right of eminent domain ; or it may, if it pleases, create a special tribunal for that purpose. On this point *Kohl* v. *United States,* 91 U. S. 367, cited and approved.

*Mr. Solicitor-General* for the plaintiff in error.

*Mr. Norman S. Gilson* and *Mr. George E. Sutherland* for the defendants in error.

Mr. Justice Field delivered the opinion of the court.

By an act of Congress passed on the 8th of August, 1846, certain lands were ceded to Wisconsin to aid in improving the navigation of Fox and Wisconsin rivers, in that State, and in constructing a canal to unite the rivers, and thus form a connection between the waters of Green Bay, in Lake Michigan, and the waters of the Mississippi. 9 Stat. 83, ch. 170.

The State accepted the cession of the lands, and in August, 1848, created a board of public works, under whose superintendence it placed the construction of the improvement contemplated. The work, however, was not done under that board ; the means furnished proved inadequate. Various other attempts, therefore, were made by different companies created by the State to carry out the improvement, and in furtherance of it Congress ceded additional lands ; but none of these at-

tempts proved successful. The improvement was only partially made.

In 1866, by various transfers, which it is unnecessary to detail, the lands ceded by Congress, and the works of improvement, including the locks, dams, canals, and other structures connected with it, became the property of a corporation known as the Green Bay and Mississippi Canal Company.

In July, 1870, Congress passed an act " for the improvement of water communication between the Mississippi River and Lake Michigan by the Wisconsin and Fox Rivers ; " by which, among other things, the secretary of war was authorized to ascertain the sum which ought to be paid to the Green Bay and Mississippi Canal Company for the transfer of its property and rights of property in the line of water communication between Wisconsin River and the mouth of Fox River, including its locks, dams, canals, and franchises, or so much thereof as, in his judgment, should be needed ; and for that purpose to join with the company in the appointment of a board of arbitrators. In making their award the arbitrators were required to take into consideration the amount of money obtained from the sale of lands ceded by Congress to aid in the construction of the water communication, which was to be deducted from the valuation found by them.   16 Stat. 189, ch. 210.

Under this act arbitrators were appointed, the value of the works ascertained, and an award made, the amount of which having been paid, the entire property was, in 1872, conveyed to the United States.   Since then the United States have been the owners and in possession of the works, and Congress has made various appropriations to carry on and complete the improvement.

The arbitrators, in making their award, proceeded upon the principle that the United States should pay for the works what their construction had cost the State, and the companies succeeding to its interests, after making a reasonable abatement for wear and decay, and deducting the amount obtained from the sale of the ceded lands.   Some of the dams constructed had caused the lands of several parties to be overflowed, and in the estimate of the amount to be paid by the United States no ac-

count was taken of the liability of the company for such damages. The question, therefore, soon arose whether the payment of these damages devolved upon the United States; and this question was submitted by the committee on commerce of the House of Representatives to the secretary of war, and by him was referred to the assistant judge advocate-general. That officer held that liability for the damages incurred from the flowage of water on the lands of others, caused by the works constructed, followed the property transferred, and devolved on the United States. Upon this opinion a bill was prepared for the assumption by them of the company's liability for such damages, which was passed by Congress and approved on the 3d of March, 1875. This act provided that whenever, in the prosecution and maintenance of the improvement mentioned, it should become necessary or proper, in the judgment of the secretary of war, to take possession of any lands, or the right of way over any lands, for canals or cut-offs, or to use any earth, quarries, or other material adjacent to the line of improvement and needful for its prosecution or maintenance, the officers in charge of the works might, in the name of the United States, take possession of and use the same, after having first paid, or secured to be paid, the value thereof, "which may have been ascertained in the mode provided by the laws of the State" wherein the property lay.

The act also provided that in case any lands or other property were then or should be overflowed or injured by means of any part of the works of the improvement theretofore or thereafter constructed, for which compensation was then or should become legally owing, and in the opinion of the officers in charge it should not be prudent to lower the dam or dams, the amount of such compensation might be "ascertained in like manner;" that the department of justice should represent the interest of the United States in legal proceedings under the act and for "flowage damages" previously occasioned, and that a portion of the appropriation made for the prosecution of the improvement, not exceeding in amount $25,000, might be applied in payment for property and rights thus taken and used.

In the previous year, 1874, the legislature of Wisconsin had passed a law providing for ascertaining the compensation to be made for damages caused to lands by their being overflowed or otherwise injured or taken by the United States in the construction of any public works. It declared, among other things, that in case the lands of any person had been overflowed or injured or taken, or if it should be found necessary or proper thereafter to overflow, injure, or take the lands of any person for or by reason of the construction of any dam, bridge, lock or pier, or the repair or enlargement thereof, or the construction, repair, or enlargement of any canal or other works of the United States government in the improvement of any harbor, river, or stream of water in the State, the compensation for damages sustained by the owner or owners of the lands overflowed, injured, or taken might be ascertained, determined, and paid in the manner prescribed in chapter 119 of the Laws of 1872, entitled " An Act in relation to railroads and the organization of railroad companies," for acquiring title to lands by railroad companies, and that all the provisions of such act properly applicable thereto should apply in the case of the overflow, injury, or taking of lands by the United States government for the purposes mentioned.

Chapter 119 of the Laws of 1872, referred to in this act of 1874, prescribes the mode in which land may be condemned for railroad purposes. The company is to file a petition for the appointment of commissioners of appraisal, with the clerk of the circuit court of the county in which the property is situated, containing, among other things, a description of the land desired and the names of parties interested in it. Notice is then to be given, by publication for three successive weeks in a newspaper of the county or adjoining county, of the filing of the petition, of the time and place of its presentation, and of the application for the appointment of commissioners. On the presentation of the petition the parties whose interest may be affected by the proceedings are at liberty to show cause against its prayer. If no sufficient cause be shown, the court or judge may grant the petition and appoint three disinterested and competent freeholders, resident in the county or adjoining

county, to ascertain and appraise the compensation to be made to the owner or owners of the property. Either party to the proceeding, if dissatisfied with the award rendered, may appeal from it to the circuit court, where a trial is to be had by a jury, and the compensation fixed by them. The proceeding, so far as the ascertainment of compensation is concerned, there takes the form of a regular action at law, in which the petitioner becomes the plaintiff and the contestants the defendants. The chapter also provides that the party interested in the land may institute and conduct the proceedings to a conclusion if the company delay or omit to prosecute the same.

Under the legislation referred to, the present proceeding was instituted by the defendants in error to recover the value of certain lands which had been overflowed by a dam constructed by the canal company in the prosecution of the improvement mentioned. In their petition they ask for the appointment of commissioners for the appraisal of certain lands, which are described, and of the damage caused to them by a dam constructed by the canal company, but owned by the United States, they having succeeded to the title and possession of the company. They also set forth the ownership of the lands, the injury to them from the dam causing the waters of Lake Winnebago to set back and overflow them, and that the dam cannot be maintained without a continuance of such injuries. All the allegations required by the statute were set forth. Commissioners were accordingly appointed, before whom the parties interested appeared, the United States being represented by counsel retained by the department of justice. They awarded the petitioners the sum of $8,000. From this award both parties appealed to the circuit court, where the case was tried before a jury. Previously, however, to its being impanelled the defendants objected to the action of the court on three grounds: First, that it had no jurisdiction of them; second, that it had no jurisdiction to try a cause in which the United States were a party; and, third, that the act of Congress of March 3d, 1875, was unconstitutional in that it assumed to confer upon the State court authority to try a cause in which the United States were a party. These objections were overruled, and the

trial resulted in a verdict for the plaintiffs for $10,000. The judgment entered thereon was affirmed by the supreme court of the State, and from that court the case is brought here on writ of error.

Various exceptions were taken to the rulings of the court on the trial, but as they do not involve any question of federal law they are not open for consideration here. The only point presented upon which we can pass relates to the jurisdiction of the court below; if that can be sustained its judgment must be affirmed.

The position of the counsel of the United States in the court below, as we understand it, was substantially this: That the power vested in the federal government to take private property for the public uses of the United States is, in its nature, exclusive, and its exercise by any State is therefore prohibited as completely as though the prohibition were expressed in terms; that the power cannot, therefore, be delegated to the State of Wisconsin; that the ascertainment of the compensation is involved in the exercise of the power as a necessary part of it, inasmuch as there can be no lawful taking until compensation is made; and that the act of Congress transferring to the State board and State court the function of ascertaining the value of the property taken, and the amount of compensation to be made, is therefore invalid.

There is, in this position, an assumption that the ascertainment of the amount of compensation to be made is an essential element of the power of appropriation; but such is not the case. The power to take private property for public uses, generally termed the right of eminent domain, belongs to every independent government. It is an incident of sovereignty, and, as said in *Boom* v. *Patterson*, 98 U. S. 106, requires no constitutional recognition. The provision found in the Fifth Amendment to the federal Constitution, and in the Constitutions of the several States, for just compensation for the property taken, is merely a limitation upon the use of the power. It is no part of the power itself, but a condition upon which the power may be exercised. It is undoubtedly true that the power of appropriating private property to public uses vested in the general govern-

ment—its right of eminent domain, which Vattel defines to be the right of disposing, in case of necessity and for the public safety, of all the wealth of the country—cannot be transferred to a State any more than its other sovereign attributes; and that, when the use to which the property taken is applied is public, the propriety or expediency of the appropriation cannot be called in question by any other authority. But there is no reason why the compensation to be made may not be ascertained by any appropriate tribunal capable of estimating the value of the property. There is nothing in the nature of the matter to be determined which calls for the establishment of any special tribunal by the appropriating power.

The proceeding for the ascertainment of the value of the property and consequent compensation to be made, is merely an inquisition to establish a particular fact as a preliminary to the actual taking; and it may be prosecuted before commissioners or special boards or the courts, with or without the intervention of a jury, as the legislative power may designate. All that is required is that it shall be conducted in some fair and just manner, with opportunity to the owners of the property to present evidence as to its value, and to be heard thereon. Whether the tribunal shall be created directly by an act of Congress, or one already established by the States shall be adopted for the occasion, is a mere matter of legislative discretion. Undoubtedly it was the purpose of the Constitution to establish a general government independent of, and in some respects superior to, that of the State governments—one which could enforce its own laws through its own officers and tribunals; and this purpose was accomplished. That government can create all the officers and tribunals required for the execution of its powers. Upon this point there can be no question. *Kohl* v. *United States,* 91 U. S. 367. Yet from the time of its establishment that government has been in the habit of using, with the consent of the States, their officers, tribunals, and institutions as its agents. Their use has not been deemed violative of any principle or as in any manner derogating from the sovereign authority of the federal government;

but as a matter of convenience and as tending to a great saving of expense.

The use of the courts of the States in applying the rules of naturalization prescribed by Congress, the exercise at one time by State justices of the peace of the power of committing magistrates for violations of federal law, and the use of State penitentiaries for the confinement of convicts under such laws, are instances of the employment of State tribunals and State institutions in the execution of powers of the general government. At different times various duties have been imposed by acts of Congress on State tribunals; they have been invested with jurisdiction in civil suits and over complaints and prosecutions for fines, penalties, and forfeitures arising under laws of the United States. 1 Kent, 400. And though the jurisdiction thus conferred could not be enforced against the consent of the States, yet, when its exercise was not incompatible with State duties, and the States made no objection to it, the decisions rendered by the State tribunals were upheld. Whatever question might arise as to such delegation of authority, we can see none where the inquiry relates to an incidental fact, not involving in its ascertainment the exercise of any sovereign attribute. Almost, if not quite from the first year of its existence, it has been the practice of the general government, when necessary to take private property for public uses, to resort to State boards and tribunals to ascertain the value of the property and hence the compensation to be made. *Burt* v. *Merchants' Ins. Co.*, 106 Mass. 356. In recent statutes such resort is expressly prescribed. For example, on the 3d of March, 1879, an act was passed for improving a part of Tennessee River, which provided that, whenever it became necessary to take private property, " the price to be paid shall be determined, and the title and jurisdiction procured, in the manner prescribed by the laws of the State of Alabama." And, on the 14th of June, 1880, an act was passed making an appropriation for constructing reservoirs on the head waters of the Mississippi, with a provision that " injuries occasioned to individuals by the overflow of their lands shall be ascertained and determined by agreement, or in accordance with the laws of

Minnesota." These are but examples of many instances of legislation where resort is had to local boards or tribunals to ascertain particular facts by which the general government may be guided in its action. Whatever assent may be necessary to the validity of the proceedings against the United States, owing to their general immunity from process, is given by such legislation.

The provisions of the act of 1875, with reference to the property overflowed by dams constructed in the improvement of the navigation of Fox and Wisconsin rivers, that the compensation to be made shall be ascertained in the mode and manner prescribed by the laws of the State, and that in any proceedings to ascertain such compensation the interests of the United States shall be represented by the department of justice, constitute a sufficient waiver of immunity. The legislation amounts to a consent to such proceedings as the State laws authorize for the condemnation of property in which the United States are interested. In the present case the overflow of the property for which compensation was asked was caused whilst the property was held by the canal company, before its acquisition, in 1872, by the United States; and the legislation is, in legal effect, little more than a declaration that the United States will pay the compensation which may be awarded by officers of the State in proceedings taken in accordance with its laws. In any aspect in which the legislation can be viewed, we see no objection to it arising out of the independent or sovereign character of the government of the United States.

*Judgment affirmed.*