Velte vs. The United States.

VELTE, Respondent, vs. THE UNITED STATES, Appellant.

*February 27 — March 18, 1890.*

*Flowage of land by government dam: Raising of dam by third person: Instructions to jury: Time of actual taking: Interest on value: Special verdict.*

1. Where lands are flowed by reason of obstructions placed by an unauthorized person upon a dam owned and controlled by the United States, the government is responsible for such flowage unless it promptly removes such obstructions.     •

2. In an action to recover damages for the permanent submergence of lands by a government dam, an instruction to the jury that the government was not liable for flowage caused by an extraordinary freshet was properly refused.

3. When lands are completely submerged and their use destroyed by a government dam, the time of such submergence, and not the date of an appraisement by commissioners, is the time of their actual taking, and interest on their value may be allowed accordingly.

4. An apparent error in submitting for a special verdict the question, " What *is* the value of the lands permanently flowed," was cured by an instruction to the jury to determine the value at the time of the taking,— the evidence of value, also, having been confined to that time.

APPEAL from the Circuit Court for *Winnebago* County. The facts are sufficiently stated in the opinion. The defendant appeals from the judgment entered upon the special verdict in favor of the plaintiff.

For the appellant there was a brief by *A. E. Thompson* and *E. E. Chapin,* and oral argument by *Mr. Thompson.* To the point that the United States is not liable for any damages which may have resulted to the plaintiff from the acts of persons who put stone, timber, or other material upon the dam in 1880–81, they cited *Saxby v. M., S. & L. R. Co.* L. R. 4 C. P. 198; Coulson & F. on Waters, 658; *Daniels v. Potter,* 4 Carr. & P. 262; Gould on Waters, sec. 399; Wood on Nuisances, 867.

For the respondent there was a brief by *Eaton & Wood,*

and oral argument by *M. H. Eaton.* As to the defendant's liability for damages caused by the acts of other persons, they cited, besides cases cited in the opinion, Bish. Non-Cont. Law, secs. 965, 966; *Nichols v. Minneapolis,* 33 Minn. 430; *King v. Oshkosh,* 75 Wis. 517; *Schmidt v. C. & N. W. R. Co.* 83 Ill. 405; *Aurora v. Bitner,* 100 Ind. 396; *Elliot v. Concord,* 27 N. H. 208; *Batty v. Duxbury,* 24 Vt. 158.

ORTON, J.   Proceedings were taken under the laws of the United States and of this state to obtain compensation for the flowage of the land of the plaintiff by means of the dam at Menasha, as a part of the works of the improvement of the Fox and Wisconsin rivers, belonging to the United States.   The case was tried on appeal from the report of commissioners awarding to the plaintiff no compensation, because the plaintiff's land was not flowed by means of said dam.   The principal questions to be determined in the circuit court were, therefore, whether the plaintiff's land was flowed or injured by means of said dam, and, if so, what should be the reasonable compensation therefor.

Cases of this sort are quite familiar to the bar and courts of this state, and involve well-known and established principles; and every question raised on this appeal has been decided by this court.   It would be useless to consider to any great extent the questions of fact determined by the evidence.   The testimony, as in other like cases, is conflicting and contradictory.   It is not the province of this court to determine its credibility.   It is sufficient if there is evidence, which the jury had a right to believe, to sustain their findings.   The special verdict of the jury is as follows: " (1) Is the plaintiff the owner in fee of the S. W. ¼ of the S. E. ¼ of section 31, town 20, range 14 E.?   *Answer.* Yes. (2) Since August 3, 1866, and prior to the commencement of this action, has the defendant's dam at Menasha been changed?   *A.* Yes.   (3) If you answer the last question

'Yes,' has such change damaged the land of the plaintiff by flowage? *A.* Yes. (4) If you answer the last question 'Yes,' then state how many acres of said land, if any, have been permanently flowed by reason of said dam. *A.* Twenty acres. (5) How many acres not permanently flowed, if any, have been injured, by soaking or otherwise, by reason of said dam? *A.* Not any. (6) What is the value per acre of the lands, if any, permanently flowed? *A.* $15 per acre. (7) What is the damage, if any, to the lands that have been injured, but not permanently flowed? *A.* Nothing. (8) If the plaintiff is entitled to recover, at what sum do you assess his damages? *A.* $485.50."

There was testimony to support these findings. The testimony shows that the dam in question was built across the Menasha outlet of the Fox river into Lake Winnebago, in 1849. After that the dam was improved at different times, but was not raised so as to flow any of said land until 1869. After that it commenced to affect said land more and more. In 1876 a new dam was built, of such height that it continued to flow said land to some extent; and in the winter of 1880 and 1881 a large quantity of stone and other material was placed upon the dam, which raised the water so as to completely submerge the said twenty acres of said land, as found by the jury, and it has remained so submerged ever since. In 1882 the United States commenced the building of a new dam; and it was completed in 1886 or 1887, and has stood at such height as to continue the complete overflow of said twenty acres, and rendered it, in the opinion of several witnesses, entirely worthless for any purpose. The land of the plaintiff is situated on the northwest shore of Lake Poygan, an enlargement of the Wolf river; and by the course of the current, as it passes through the Wolf river, Lake Winneconne, and Lake Butte des Morts, and of the Fox river through Lake Winnebago to the Menasha dam, it is about fifty miles. But

by a direct line the land is only about twenty-one miles from the dam. The current, if any, is sluggish, and the fall slight, so that the land is affected or flowed, by means of the dam, by even a slight elevation in its height above that which it had when the land was not flowed by it.

If the defendant was not responsible for the raising of the dam in 1880 and 1881, when it first caused the plaintiff's land to be flowed, the evidence tends to show that it has continued to be flowed all of the time since. What particular changes in the dam have produced such a result may be uncertain; but one thing seems to be very certain, and that is that the dam has caused the land to be overflowed, according to the testimony for the plaintiff, and that is the important question. The changes in the dam which have caused it, as in other like cases, is a question upon which the testimony is likely to be conflicting and contradictory; and it is very difficult, if not impossible, in some cases to account for the fact that a dam which did not at one time, in an ordinary stage of water, flow certain lands above, has afterwards done so. It may be by raising its height by embankment or flush boards, or by tightening it and increasing its capacity to hold back the water, or by setting in operation processes of nature, such as the gradual accumulation and deposit of mud or the growth of vegetation in the stream, causing obstructions, or other intermediate natural causes which are attributable to the dam as the primary cause. If it is not made perfectly clear what changes in this dam have been made, the testimony of surveyors and civil engineers on behalf of the plaintiff establishes the fact that the dam has caused the flowage. That the land is submerged appears to be an unquestionable fact, and there must be some cause for it.

Further reference to the testimony is not necessary, except in connection with the assignment of errors, which we will now consider.

1. The testimony tends to show that a Mr. Lawson, or other person in charge of the water power created by this dam, raised it, by stone and other means, in the winter of 1880 and 1881, and the first point made by the learned counsel of the appellant is that the defendant is not responsible for it or the flowage occasioned thereby, and that the court refused an instruction to that effect. The testimony of Fuller, the local civil engineer, was that he was aware of the fact that the dam had been thus raised, and he waited for orders or instructions to remove the stone and other materials by which it had been so raised, and they were not removed until in 1882, about the time they commenced the building of the new dam. There was certainly great delay in removing them, and the jury had a right to find that they remained on the dam by the negligence of the defendant, and that the defendant was responsible for the damages caused by them on account of such negligence. The jury must be presumed to have so found, for the court instructed them that "it was the duty of the government to use due care and diligence in looking after their dam, and, if any party has put obstructions thereto or thereon, to *promptly* remove the same." This is a proper statement of the law. The neglect of the defendant to promptly remove the obstruction made it its own. *Kittredge v. Milwaukee*, 26 Wis. 47; *Hammond v. Mukwa*, 40 Wis. 35; 2 Hil. Torts, 408; *Phillips v. Veazie*, 40 Me. 96; and other cases cited in the respondent's brief. The answer alleges that the defendant and the state "have, respectively, held continuous, uninterrupted, and exclusive possession" of the dam since its completion. This would seem to make the defendant responsible for all changes made in the height of the dam at any time or by any one. The right to use this dam for hydraulic power or milling purposes is subordinate to the right of the government to use it as a part of the improvement. Such private water-

powers are only such as are created incidentally by the necessity of the improvement, and the private owner has no right to interfere with the dams or other works without the consent of the government. If those in special charge for the government permit such interference, it becomes responsible for any damages occasioned thereby. *Arimond v. G. B. & M. Canal Co.* 35 Wis. 41.

2. The counsel of the government asked the court to instruct the jury that, where works have been constructed in a public river by public authority, there is no liability for damages for flowing of lands caused by an extraordinary freshet, which could not have been reasonably anticipated and provided against. The court properly refused to give this instruction for the reasons (1) that it is an abstract proposition of law; and (2) that it is inapplicable to the case. The case, as well as the recovery, depended upon the fact that the land was completely and *permanently* submerged and rendered entirely worthless. Extraordinary floods could not cause such effects. The cause must be as continuous and permanent as the effect, and extraordinary floods are only temporary; and no damages are claimed or recovered on account of any such cause. The instruction might be good law in a proper case. But there was no evidence of any such extraordinary floods that could not have been anticipated. They were not very unusual. The dam should have been so made as not to allow such floods to flow plaintiff's land. *Borchardt v. Wausau Boom Co.* 54 Wis. 107.

3. The learned counsel of the appellant contends that the court erred in allowing a recovery as for lands permanently flowed, and in fixing the time when they became completely submerged and their use destroyed as the time of their *actual taking* by the government, and allowing interest on their value from such time. As above stated, the jury had the right to find from the testimony that the land

had been so flowed since the winter of 1880 and 1881. The court allowed interest not to exceed six years before the action was commenced. The learned counsel contends that the time of the taking was at the date of the appraisement by the commissioners, and that interest should only have been allowed on the value of the land from that date. These questions were decided by this court, and we still think correctly, in *Sweaney v. U. S.* 62 Wis. 400. The time of the taking is the time when they are first flowed permanently, and their value lessened or destroyed. That is when the government takes the land for its own use, and makes the railroad law applicable as far as possible. And the same rule applies as in cases of the wrongful taking of property. *Arpin v. Burch,* 68 Wis. 619. See, also, *Arimond v. G. B. & M. Canal Co.* 35 Wis. 41; *Pumpelly v. Green Bay Co.* 13 Wall. 166; *Jones v. U. S.* 48 Wis. 385; *Zemlock v. U. S.* 73 Wis. 363; *U. S. v. Jones,* 109 U. S. 513.

4. The counsel of the appellant asked the court to submit to the jury the question: "What *was* the value per acre of the lands permanently flowed at the time they were so permanently flowed?" The question submitted to and answered by the jury was: "What *is* the value of the lands, if any, permanently flowed?" This is assigned as error. This apparent error was cured by the instruction of the court in connection with the question, that "you will ascertain from the evidence what *was* the value of the land at the time of the taking, and that will be the damages, with interest added, for such lands." The question asked is in the present tense, as if it was asked of the jury: "What do you say is the value of the land permanently flowed?" or "What value do you find?" for brevity. The testimony of the witnesses as to the value of the land was confined to the time it was first permanently flowed.

5. The counsel of the appellant requested the court to submit to the jury certain questions, and to give certain

instructions, which request was denied. Most of such questions were the same, in substance, as those submitted; and the others were matters of evidence rather than issues of fact, and not necessary for a full finding of the issues. The questions answered seem to have covered the whole case. The court gave substantially all of the instructions asked that were applicable to the facts and contained a correct statement of the law. The instructions given were full and fair, and substantially correct. The case was ably and fairly tried, and the result appears to be just and right; and we find no errors which ought to reverse the judgment.

*By the Court.*— The judgment of the circuit court is affirmed.