**WELCH et ux. v. TENNESSEE VALLEY AUTHORITY (two cases).**

**LEWIS et al. v. SAME.**
**Nos. 7972, 7973, 8001.**

Circuit Court of Appeals, Sixth Circuit.
Dec. 12, 1939.

S. E. Hodges and R. R. Kramer, both of Knoxville, Tenn. (C. K. Ellis, of Rutledge, Tenn., and Hobart Atkins, of Knoxville, Tenn., on the brief), for appellants Welch.

R. R. Kramer and J. V. Overton, both of Knoxville, Tenn. (Poore, Kramer & Cox, of Knoxville, Tenn., on the brief), for appellants Lewis and others.

William C. Fitts, Jr., of Knoxville, Tenn., and H. James Hitching, of Chattanooga, Tenn. (James Lawrence Fly, of Knoxville, Tenn., Herbert S. Marks, of Portland, Or., Alvin Ziegler, of Chattanooga, Tenn., Frank Montgomery, of Knoxville, Tenn., and Bessie Margolin and Philander Claxton, Jr., both of Washington, D. C., on the brief), for appellee.

Chas. I. Dawson and Woodward, Dawson & Hobson, all of Louisville, Ky., amici curiae.

Before ALLEN, HAMILTON and ARANT, Circuit Judges.

HAMILTON, Circuit Judge.

These three appeals are from awards rendered by a statutory three-judge Federal District Court in condemnation proceedings brought by the United States for the use and benefit of the Tennessee Vally Authority pursuant to Section 25 of the Act of its creation, 48 Stat. 58, 70, 16 U. S.C.A. § 831x. In Nos. 7972 and 7973, the appellants complain of the court's denial of their motions for a jury trial.

All of the appellants were owners of separate tracts of land fronting on the Clinch River, some alluvion, which was at times lost by abrasion due to the natural movement of the stream, and others fast, upland-bottom, rolling and hilly lands, some of it subject to annual and some to infrequent overflow. Part of it was covered with timber, part arable, some sterile and rocky, and all of it located in Grainger and Claiborne Counties, Tennessee. The property was condemned for use by the Government in the Norris Dam Reservoir.

The pertinent provisions of the applicable statutes, 48 Stat. 58, 71 as amended, 49 Stat. 1075, 16 U.S.C.A. § 831x provide that the corporation in the name of the United States may institute condemnation proceedings in the United States District Court in the district in which the property is located. Upon the filing of the petition the court shall appoint as commissioners, three disinterested persons who are not residents of the locality and who shall take an oath that they do not own or have any interest, direct or indirect, in the property.

Each commissioner receives compensation not exceeding $15 per day and in addition $5 per day subsistence, for the time actually spent in the performance of his duties. They are required to inspect personally the property sought to be condemned and, after notice to the parties in interest, to conduct hearings, receive evidence and generally take such appropriate steps as may be proper for the determination of value and are authorized to administer oaths and subpoena witnesses who shall receive the same fees as provided for witnesses in the Federal courts.

The commissioners are required to file their reports in writing with the Distrct Court setting forth their conclusions as to the value of the property, making a sep-

arate award and valuation as to each separate parcel. Upon the filing of the reports, the Clerk of the Court shall give written notice to interested parties of the award in such form as directed by the judge.

Any interested party may, within twenty days from the date of filing, take exceptions to the award which shall be heard before three Federal District Judges unless the parties stipulate in writing for a lesser number, the hearing being de novo.

Within thirty days from filing of the decision of the judges, any interested party may appeal to the Circuit Court of Appeals which shall, upon the hearing, dispose of the case upon the record without regard to awards or findings theretofore made by the commissioners or District Judges and fix the value of the property.

In No. 7972, appellee filed its petition on August 8, 1935, and its declaration of taking pursuant to Section 258a, Title 40 U.S. C.A., and paid into the registry of the court $2,713.13, the amount estimated by appellee as just compensation for the lands and the District Court entered an order putting it in full, immediate and quiet possession thereof and directed appellants to surrender their possession to the appellee. The court appointed commissioners who made their report May 16, 1936, and fixed the value of the land at the amount estimated by the appellee to be just compensation for its taking.

On June 4, 1936, the appellants filed their exceptions and demanded a trial de novo before a jury on the ground that if the Act be construed as dispensing with a jury, that part of it was violative of the Fifth and Seventh Amendments to the Constitution, U.S.C.A.

On August 23, 1937, the District Court overruled appellants' motion and refused to transfer the case to the jury docket to assess damages. On August 27, 1937, the cause was submitted to a statutory court of three Federal District Judges and, after hearing proof, the court declined to increase the award of the commissioners.

The same procedure and steps were taken in No. 7973, except in the declaration of taking filed by appellee, just compensation was estimated at $14,409.38 and was increased by the commissioners to $15,760 which was not disturbed by the court.

In No. 8001, the same procedure was also taken except no motion was made for a jury trial and appellee estimated that just compensation for the lands was $27,628.64, which the commissioners increased to $32,-074.00 which was sustained by the court.

The Seventh Amendment to the Constitution of the United States provides that "in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved * * *." In order to ascertain the scope and meaning of this amendment, resort must be had to the practice at common law in similar proceedings when this amendment was adopted in 1791. Thompson v. Utah, 170 U.S. 343, 350, 18 S.Ct. 620, 42 L.Ed. 1061; Patton v. United States, 281 U.S. 276, 288, 50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263.

Jury trial at common law was not applicable to all common law actions, but was grudgingly conceded by the Crown as to some and when our Constitution was adopted, was inapplicable to cases at common law where property was taken for public use. Kohl v. United States, 91 U.S. 367, 376, 23 L.Ed. 449; Minneapolis & St. Louis R. & R. Co. v. Bombolis, 241 U.S. 211, 219, 36 S.Ct. 595, 60 L.Ed. 961; Bauman v. Ross, 167 U.S. 548, 593, 17 S.Ct. 966, 42 L.Ed. 270; Metropolitan R. & R. Co. v. District of Columbia, 195 U.S. 322, 328, 25 S.Ct. 28, 49 L.Ed. 219; Briscoe v. District of Columbia, 221 U.S. 547, 551, 31 S.Ct. 679, 55 L.Ed. 848. Federal judicial procedure in this field lies partly at equity and partly at law. Searl v. School District, 124 U.S. 197, 199, 8 S.Ct. 460, 31 L.Ed. 415.

The procedure applicable when private property is taken for public use is exclusively a product of our legislative and judicial systems. The phrase "eminent domain" appears to have originated with Grotius who carefully described its nature (Lewis on Eminent Domain, Section 3; Mills on Eminent Domain, Section 5; 1 Thayer, Cases on Constitutional Law, 945), and the power is universal and as old as political society. The American Constitution did not change its scope or nature, but simply embodied it in the fundamental law. Notwithstanding the recognition of its nature in our Constitution, it is procedurally unknown to the English law, there being no eminent domain in English Jurisprudence. The power to take was fundamentally included in its system of Government but the obligation to compensate was lodged in the absolutism of Parliament. 6 Halsbury Laws of England, 1.

Under the common law system prevailing at the time of the adoption of our Constitution, one seeking relief for injuries proceeding from the Crown was faced with the peculiar sanctity of the King, since it was a part of the fundamental law of England that he could do no wrong. However, it was recognized there might be something amiss in the conduct of public affairs because of misinformation or inadvertence, when the Crown invaded the private rights of his subjects and relief was granted the citizen by a petition of right. Cooley's Blackstone, 4th Ed., Vol. 2, p. 254. Stat. of Chas., I, approved June 7, 1768. This was a proceeding in chancery by which a subject might recover property in the possession of his King. Coke, 4th Inst. 419, 422; Cooper, Equity Pleading, 22, 23.

The maxim that "the King can do no wrong" has no place in American constitutional law. The State itself which is the sovereign people in corporate organization may no more wrong an individual with impunity than may any private person. However, the State is not suable except with its consent, it being inconsistent with its sovereignty that it should be brought against its will into courts which are created and exist at its pleasure. The State may also, when providing for its own needs under the right of eminent domain and taking for such purpose the property of individuals, give all necessary protection to its agents and relegate the owner to such remedy as it deems proper, provided it is adequate and accords to the citizen due process, and without any reference to the Seventh Amendment. Chappell v. United States, 160 U.S. 499, 510, 16 S.Ct. 397, 40 L.Ed. 510.

Courts of England, at the time of the adoption of the Constitution, did not lack the power to fix damages in many cases at common law. They frequently fixed the amount on judgment by default and on demurrer. Rolle's Abr. Title Damages. In 1770, Chief Justice Wilmot held as had been previously declared in 1764, that a writ of inquiry in an action of tort is an inquest of office to inform the conscience of the court which could itself have assessed the damages without any inquest. Beardmore v. Corrington, 2 Wils. 244; Bruce v. Rowlins, 3 Wils. 61; 2nd Finlason's Reeves History of English Law, 610.

The usual method of determining the value of private property taken for public use has been to accord the land owner at some stage of the proceedings the right to have his damages assessed by a jury. This is not inherent in the Federal Constitution but is a matter of legislative discretion, restricted only by the provisions of the Fifth Amendment. It is generally recognized that a jury coming from the community has in some respects a great advantage in determining the value of property, but it is often open to strong objection, especially when the question in dispute is of local import making it impossible to obtain a disinterested jury without bringing the members from a great distance. This may have motivated the Congress to depart from the usual practice in determining the value of property acquired under the Government's power of eminent domain for development of the Tennessee River and its tributaries. In any event, it is not a matter subject to judicial control.

The instant cases are not suits at common law in which the right to trial by jury prevailed, but are purely statutory proceedings. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 49, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

The Act here in question provided a mode for contesting the taking and valuation of appellants' property in the ordinary courts of justice with such notice to the owners as was appropriate to the nature of the case. In our opinion, it is in no way contrary to the Fifth Amendment. United States v. Jones, 109 U.S. 513, 519, 3 S.Ct. 346, 27 L.Ed. 1015.

As we view the provisions of the applicable statute, these appeals are equitable in nature and the questions presented are of fact only, depending upon the weight given to the oral testimony and the commissioners' findings and the lower court's conclusion thereon must be accepted here unless the evidence decidedly preponderates against it.

In condemnation cases in considering value, it is well settled that the most profitable use to which land may be put in the near future may be considered as an element bearing on market value, and the fact that such use may be made only in connection with other contiguous lands does not exclude it as evidence if such connection is reasonably sufficient to affect market value. Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236.

The determination of the market value of property can be no more than an approximation. This is particularly true as to real estate in the country where sales are few and the elements entering into the determination of its value so varied in character. Experience discloses that the most competent witnesses often differ widely in their opinions as to value of identical property. The testimony of such persons however, if familiar with the territory and its surroundings, is competent. Conclusions of courts are often reached by comparison of various estimates. Montana Railway Company v. Warren, 137 U.S. 348, 353, 11 S.Ct. 96, 34 L.Ed. 681.

Appellant in No. 7972 owned a tract of land consisting of 78.1 acres, which he purchased on credit for $2,250 from James A. Welch, his cousin, approximately four years before the institution of these proceedings. The property had on it a frame tobacco barn, 30x40 feet; a house with one room of logs and two rooms boxed and two or three never-failing springs. Topographically, it was composed of five acres of river and branch bottom land subject to annual overflow, twenty-three acres of cleared uplands, some rolling knobs and fifty acres of woodland, covered with second growth beech, white oak, chestnut oak, black gum and pine trees ranging downward from twenty inches in diameter. Appellant built one room to the house and a corn crib after he purchased it. The testimony of the witnesses as to value ranged from $5,185 to $2,200.13.

Appellants' objection to the valuation is that the court did not give due weight to the evidence as to the earning capacity of the land when cultivated in corn and to the value of young timber which had not reached marketable size. They concede that the profits from the operation of the farm should not be included as an item of compensation or damages, but they earnestly insist that the reasonably prospective profits that would be earned from corn and growing young trees is superior evidence which was ignored.

Rental value is always admissible in determining market value of real estate and actual earnings from the property is also of weighty consideration, but if speculative, these two types of evidence are of no value.

Anticipated profits from any business, especially farming, are too uncertain and speculative in character to be of much weight in determining farm values. Their realization depends more upon general business conditions, trading, skill and business acumen of the proprietors and weather changes than upon location.

The same handicap is inherent in estimating profits to be realized from the sale of young trees many years from merchantable size. Location and accessibility to market are important factors in valuing timber and young pines might have a market value as Christmas trees near congested centers of population and none if remote therefrom.

This character of testimony leads us into the forbidden domain of conjecture and speculation. From the evidence here it would be impossible to do more than guess what profit, if any, would be realized from the production of corn on the lands in question and there is equal uncertainty as to the market value of young trees too small for manufacture. If this rule needed an illustration, it is found in the testimony of the appellant, Sam Welch: "I never paid J. A. Welch any cash down. * * * I haven't made enough on the land yet to start paying on it." Backus v. Fort Street Union Depot Company, 169 U.S. 557, 574, 18 S.Ct. 445, 42 L.Ed. 853.

In No. 7973, the appellants owned a tract of land consisting of 250 acres, 45 acres of bottoms and banks, 80 acres of cleared uplands and 125 acres with cut-over timber on it. The property had one large and two small barns on it, one dwelling house, one tenant house and two corn cribs and was well-fenced. The testimony of value ranged from $30,850.00 to $14,409.38.

Appellants' objections to the commissioners' valuation and that of the court are identical with those in No. 7972 and the same rule is therefore applicable.

In No. 8001, appellants owned three tracts of land located in Claiborne County, Tennessee. Tract No. 1 was owned by appellant, William H. Lewis, and contained 143 acres, tract No. 2 was owned by the four appellants, S. A. Lewis, Joseph N. Lewis, W. H. Lewis and J. A. Lewis, and tract No. 3 was also owned by the four appellants, the total acreage consisting of 393 acres.

Tract No. 1 consisted of 5.5 acres of banks, 16.7 of bottoms, 17 of clay-gravel upland, 6 of steep upland, 74.7 of clay-gravel woodland, and 23.1 of steep, rocky woodland. This tract had improvements

of one three-room frame house, one box barn, outbuildings, fencing and a rock wall. The testimony as to its value ranged from $18,000 to $7,500.

Tract No. 2 consisted of 32 acres of banks and bottoms, 15 of gravel-slate upland, 18.2 of gravel-slate upland, 87.8 of woods. The improvements consisted of a ten-room frame residence, frame barns, chicken houses, springs, smokehouse, sheds and other outdoor structures, about 750 rods of fencing, two small orchards and timber. The testimony as to its value ranged from $28,000.00 to $13,000.00.

Tract No. 3 consisted of 9 acres of banks, 16.7 of gravel-slate upland, 70.9 of woods, a three-room box house, one box barn, smokehouse, about 250 rods of fencing, fruit trees and timber. The testimony as to its value ranged from $11,425 to $4,000.

■■ The questions raised by the appellants relate exclusively to the weight and sufficiency of the evidence to sustain the judgment, and they insist that because of the provisions peculiar to the statutes under these proceedings, the burden rests on this Court to weigh the evidence as though sitting as a trial court, but we do not so construe the statute.

The court, when sitting without a jury, may take into consideration the witnesses' sources of knowledge, their interest, good intentions, their seeming honesty, their respective opportunities for personal knowledge of the facts about which they testify and their conduct and manner on the witness stand. All of these things may be considered in determining the weight which should be given to a statement, some of which may be so adverse to the testimony of the witness as to justify a trial court in ignoring it. It follows that this Court, not having the opportunity to observe the witnesses and there being absent in the printed record the essentials for a judicial weighing of their testimony on appeal, will not reject the findings of the lower court unless it is apparent it has misapprehended the evidence or gone against its clear weight.

■ In considering the weight of evidence, it is to be remembered that the burden of proving the value in a condemnation proceeding is upon the property owner. Ralph v. Hazen, 68 App.D.C. 55, 93 F.2d 68; Lebanon & Nashville Turnpike

Co. v. Creveling, 159 Tenn. 147, 17 S.W. 2d 22, 65 A.L.R. 440.

■ Witnesses testifying as to value must appear to have some peculiar means of forming an intelligent and correct judgment beyond what is presumed to be possessed by persons generally and in weighing their testimony, triers of fact may take counsel of their own experience and knowledge of like subjects. Shoemaker v. United States, 147 U.S. 282, 306, 13 S.Ct. 361, 37 L.Ed. 170.

■ However, they may not substitute their inexperienced opinions for those of witnesses with special knowledge. Town of Hingham v. United States, 1 Cir., 161 F. 295, 15 Ann.Cas. 105. Sales at arms length of similar property are the best evidence of market value. However, in the absence of such sales, there is no single measure of value which may be applied rigidly and uniformly in the determination of the market value of lands, and each case must be considered in the light of its own facts. Assuming these premises, it is doubtful whether the market value of farm lands can be accurately determined, except in rare instances, by the use of any one measure or a consolidation of all of them. Opinion evidence is relevant and frequently persuasive, its weight depending on its origin and the extent to which it is supported by facts. Standing alone, it is inconclusive and often tainted.

■ Appellant, J. A. Lewis, was an experienced farmer and lumberman and valued the three tracts in question at $54,-000. Appellant, W. H. Lewis, valued them at $54,800; Mark Lewis, a banker and farmer and their cousin, valued the property at $50,200; S. B. Nicely, a farmer living in the neighborhood, gave as his opinion that the lands were worth $46,-900; M. M. Lay, a farmer also living in the neighborhood, valued the property at $45,585; J. E. Loop, a farmer and neighbor, valued it at $38,360; William Spence, living about ten miles distant but who at one time had worked on this land, valued it at $55,425; J. A. Lewis testified that he had made a thorough cruise of the timber on the property from eight inches up, and that there were 1,619,000 feet on the three tracts which he valued at $11,200. He used the scale of prices of stumpage for that territory published by the United

States Department of Agriculture in the year 1935.

None of these witnesses based their opinions on sales of similar property or an accurate statement of crop production or farm income. Their opinions are not based upon facts and their evidence has slight probative force. Head v. Hargrave, 105 U.S. 45, 51, 26 L.Ed. 1028; Patterson v. Commissioner, 2 Cir., 42 F.2d 148.

 Appellee's witness, Mack DeVault, one of its appraisers who had been in the real estate business for twenty-one years buying and selling farms, testified the property had a fair market value of $23,-888.12.

J. W. Chumlea, Sheriff of the county and a member of the County Court and who had lived in the community for thirty-five years, valued the property at $21,000.

Joe Yoakum, who owned a farm in Claiborne County and was Superintendent of Roads of that County, valued it at $27,-936.

E. G. Price, formerly an appraiser for the T. V. A., and real estate man, testified that tract No. 2 had a value of $14,261.-65 and tract No. 3, $4,846.40.

Ed Jennings, a farmer and Justice of the Peace, and living in the neighborhood, valued the property at $24,500.

John Gilbert, an appraiser for the T. V. A. and a farmer, valued Tract No. 1 at $8,250. Wade Clark, another appraiser for the T. V. A., valued tract No. 2 at $14,261.65 and tract No. 3 at $4,846.40.

E. J. Flaut, whose qualifications were admitted by appellants, testified he cruised the timber on the lands and that there were 1,198,165 feet from eight inches up, which he valued at $3,419.74.

There is a wide diversity in the testimony of different witnesses as to the value of the property in question. In attempting to reconcile these conflicting opinions, consideration must be given to the different theories upon which they are based. When this is done, apparent conflicts may be readily ascertained, but not reconciled. In the itemized breakdown of the witnesses' estimates, the difference between them is as to the value of the so-called bank and bottom lands, the former being subject to frequent overflow, the latter to annual, and as to the value of the merchantable timber.

Appellants' witnesses valued the bank lands from $300 to $500 an acre and the bottom from $200 to $300. Appellees' witnesses valued each at $150 an acre and appellants' witnesses, in classifying the land, put more acreage in banks than did appellees' witnesses.

Appellants' witnesses undertake to support their valuation of bank and bottom lands by estimating the corn produced and its market price. No data or accurate record of either production or sale price was testified to by any of them and they assumed the same annual production without considering losses due to frequent flooding to which they attributed the fertility of the soil.

Appellants' witnesses gave scant consideration to the deposit of sand from the floods. Appellee's witnesses took these factors into consideration.

The discrepancy as to timber values arises from the testimony of appellant, J. A. Lewis, that the amount of stumpage was much greater than that of appellees' witness. Neither produced a log of his cruise.

An analysis of the testimony of these witnesses only proves the rule that the opinion of witnesses as to value of property taken in condemnation proceedings is a variable and uncertain class of testimony. Here a study of the different theories and processes submitted by the witnesses for ascertaining the value of the property leads to widely differing results and conflicting and wholly irreconcilable opinions.

The triers of the facts who saw and heard the witnesses were the best judges of the value, weight and credibility of their testimony and could best weigh the evidence.

In view of the rule that the burden of proof rests on appellants and after giving fair appraisal to all the testimony in each of the three causes, we are of the opinion the decrees of the lower court should be affirmed.