In re **CONDEMNATION OF LOTS NOS. 2, 27, 803, ETC., IN SQUARE 3960.**

Condemnation No. 2969.

District Court of the United States for the District of Columbia.

Jan. 3, 1945.

Austin L. Fickling and Leon A. Ransom, both of Washington, D. C., for James E. Roberts and Gladys S. Roberts (wife).

Oliver Metzrott and Wm. E. Carey, Jr., both of Washington, D. C., for Esther V. Dillard.

Thos. J. Jackson, of Washington, D. C., for Clarence E. Williams and Grace Williams.

Augustus W. Gray and Thurman L. Dodson, both of Washington, D. C., for Ruth E. Sample.

Philip W. Thomas and Thomas W. Parks, both of Washington, D. C., for Benj. F. Barkdall.

Rudolph H. Yeatman, of Washington, D. C., for Edw. J. McIllvane and Marie G. McIllvane.

McGUIRE, Associate Justice.

Motion denied.

Strictly speaking, the "motion to strike" interposed in these proceedings is in substance and effect a challenge to the array, and is treated as such.

"Motions to strike" do not apply in eminent domain proceedings. Rule 81, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

█ A condemnation *jury*, so called, is a *misnomer*. It is an inquest or commission appointed by the Court under authority of an act of Congress. It differs generally from an ordinary jury in important and essential aspects, and this in the District of Columbia.

(1) It *consists* of less than 12 persons.

(2) *Unanimity* is not required.

(3) Its members in the District of Columbia, must be *freeholders*. American Publishing Co. v. Fisher, 166 U.S. 464, 17 S.Ct. 618, 41 L.Ed. 1079.

█ There is no constitutional requirement under the provisions of the Fifth Amendment that the just compensation to be paid for property taken for public use shall be required to be determined by a jury as that term is commonly understood. It may (and has been in the District of Columbia, referred to Commissioners, and this comparatively latterly)—these have been appointed by the Court or by the executive—or to an inquest composing less or more than the number of men who go to make up the ordinary jury, or to arbitrators. Custiss v. Georgetown & Alexandria Turnpike Co. 6 Cranch 233, 3 L.Ed. 209; Secombe v. Railroad Co., 23 Wall. 108, 117, 118, 23 L.Ed. 67; United States v. Jones, 109 U.S. 513, 519, 3 S.Ct. 346, 27 L.Ed. 1015; Long Island Water-Supply Co. v. Brooklyn, 166 U.S. 685, 17 S.Ct. 718, 41 L.Ed. 1165. See also generally on the subject: Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270.

█ This being so Title 8, Sec. 44 U.S.C. 8 U.S.C.A. § 44 does not apply.

Indeed the practice both in England and this country before the adoption of the Constitution, was to have the amount to be paid for the public taking of private property, determined by tribunals other than *common law juries*. This fact was well known to the framers of our national charter. Lewis—Eminent Domain: 1909 Ed., Vol. II, Sec. 509, 510 P. 922.

Again under the Fifth Amendment the term *due process* in condemnation matters has been held to be synonymous with *just compensation*.

This would ordinarily dispose of the motion except it also by the fact of its being made at all levels a serious accusation against the integrity of the Jury Commission.

Under District law it is *required* generally that condemnation juries, so called, are to be made up from a *special* list of persons having the *qualifications* of jurors, and being also *freeholders* in the District of Columbia and it is argued as a basis for the "motion to strike," that for a long period of time no colored persons have been called for service on condemnation panels, and that "* * * the systematic exclusion of qualified colored persons from jury service on condemnation panels amounts to discrimination," and "that the condemnation panels are constituted by the exercise of discretion by a clerk in the Jury Commission."

█ It is clear that no person has a *constitutional* right to sit on a so-called condemnation panel—and a denial of such service is not unconstitutional, *due process*

in such cases as indicated being synonymous with *just compensation.*

Further it is admitted by the movants, and it is well to note, that they raise no *question* with reference to the *general jury lists,* it being admitted that discrimination is not practiced in their preparation, and that men and women who possess in every other respect the qualifications prescribed by law, irrespective of race, color or creed serve on grand and petit juries in the District of Columbia.

Evidence was introduced at the hearing by the District indicating that several individuals of the colored race had been called from time to time, and were either excused in open court, or were not served personally by the Marshal and as a consequence made no appearance.

It appears to be true also that with the practical abandonment of the commissioner system and before that time, neither a person of the colored race nor any female member of the white race has ever sat on a condemnation panel.

No evidence was introduced to indicate that either the Jury Commission or its clerks have any knowledge either actual or otherwise from which the color of any prospective condemnation juror can be determined or inferred.

True two or three condemnation panels certified to the Court, had in the place reserved for the *Clerk's* comment the notation "colored", but these were before the tenure of the present members, nor could such isolated and unconnected evidence in any way be attributed to the Commission or its clerks, in addition being on panel sheets certified to the Court by the Commission, after the Court had the opportunity of *seeing* the members of the *prospective* jury in open court.

The total population of the District in 1940 according to evidence (Census of 1940) introduced at the hearing was approximately 687,000 of which roughly 500,000 were whites and 187,000, more or less, non-whites including *all* persons of *color,* the great majority of whom were persons of the negro race.

There were as of that year, according to the same source, in addition about 51,000 freeholders in owner occupied homes of whom a little over 7000 were negroes—it cannot be assumed however that all the persons occupying these homes possess the qualifications of jurors in order to make them eligible—even if freeholders, for the special condemnation list of prospective condemnation juries.

■ In addition it is to be noted that the Jury Commission is required under the law to " * * * prepare a *special list* of *persons having* the *qualifications* of *jurors* as prescribed by section 11—1417 and being also *freeholders* of the District of Columbia * * *". D. C. Code 1940, § 16—603.

Now if as indicated, no question is raised as to the general jury list from which condemnation panels are drawn, how is it then that no colored condemnation jurors have ever been called and served—since they possess the necessary qualifications of general jurors, and appear on such lists, and are freeholders?

The language of the statute referred to above seems to import a broad discretion in the Jury Commission—*shall prepare* a *special list* of persons—no *female* has *ever* been *called* for such service—although hundreds of female jurors serve annually in both the criminal and civil courts as petit jurors and grand jurors, for the reason presumably that they have not the experience the statute would seem to demand as an implicit prerequisite, to service on condemnation panels, and lack other special qualifications (Cf. Title 7, Sec. 315, D.C. Code 1940) depending on the nature of the taking.

■ Undoubtedly however there are colored citizen freeholders eligible in every respect for condemnation service and they should be called but there is no evidence indicating that the Jury Commission is able to determine from *any source* either the questionnaire or the cards on which names of freeholders are placed for the general jury list, indicating either color or creed, or that they have systematically excluded persons of the colored race from such service, unless the fact they have never served is conclusive evidence to that effect.

It was admitted at the hearing that the Commission relies more on "backlog" rather than on new prospective jurors.

It was further shown—thus high lighting the problem of securing jurors generally—that about 2000 are called and a little over one-fourth found qualified for general jury service, and about one-seventh of these more or less are found to have the essential qualification of being freeholders, thus in the absence of any further statutory

disqualification making them eligible for service as condemnation jurors.

Apparently it has been the practice to keep two lists, one general and one special, for condemnation, this resulting in the creation of the so-called "backlog".

There are three separate provisions in the Code with reference to the impaneling of condemnation juries—which adds to the confusion—one relates to the present case (Schoolhouse site taking by the District), another relates to takings by the United States (Title 16, § 629, D.C. Code 1940), and the third to taking by the District, for alleys and minor streets—the latter provision requires prospective jurors to be "judicious", "disinterested" and not in the service of the United States or of the District of Columbia (Title 7, Sec. 315, D.C. Code 1940)—not in the service of the United States or the District of Columbia, being also a precedent requirement for service on juries in land takings by the United States.

There is also a provision of law which provides that juries shall be chosen as near as may be from the District generally and this again emphasizes the discretion placed in the Commissioners. The problem of securing grand and petit jurors is a real one as about six hundred general prospective jurors have to be actually called for personal appearance at Court every month in order to secure two hundred or thereabouts for general jury service and it is from these that the condemnation list has to be replenished from time to time. Presumably the difficulty has been in not changing or preparing more often a new special list, but keeping on the list jurors who have served on such panels from time to time and are reeligible for service after a year, a perfectly legal procedure—however such lists should be remade and rechecked.

In addition the general jury lists should be prepared with great care, as it has been my experience that jurors who have served are constantly being recalled for further service, after the statutory period with reference to their reeligibility has run.

Under the circumstances as developed in this proceeding there seems to me no valid reason why members of a substantial group, apparently qualified in every respect should not as appears find themselves on condemnation juries. The lists of prospective condemnation jurors should be completely revised and kept constantly fluid to insure adequate representation of all duly qualified classes of citizen property owners and full compliance with the law. That something is highly amiss there is no doubt. The error however would seem to be one of *method*, rather than deliberate exclusion.

Parenthetically, and in conclusion, it might be said the Jury Commission has long been under staffed, and able and public spirited citizens asked to perform a most important civic task without either adequate compensation or support.

█ Certainly the compensation is not attractive ($10 a day when actually engaged, not to exceed $250 each in any one year), and a staff which consists of two permanent clerks—and a temporary one. It is not peculiarly however a problem alone of the District of Columbia but the Federal Judicial system generally. But this is no reason why the Court under whose authority they serve should not guide and direct the Commission to the end that proper representation is had of all eligible citizens, not only on general juries as that term is understood but on the special condemnation panels as well, indeed it is the duty of the Court to do so.

The method of selection in all jurisdictions varies—in some as here names are culled from the city directory and like sources, in others recourse is had to "key" men, and organization rosters (See: Select Report of Committee on Selection of Jurors infra)—methods as haphazard as they are unsatisfactory, and which can lead to apparent discrimination and exclusion.

That this problem is receiving the attention it deserves is evidenced by the voluminous report, well worth reading, submitted to the Judicial Conference of the Committee on Selection of Jurors, published in September 1942, of which Mr. Justice Proctor of this Court is a member, and which recommends, among other things, for the more populous areas such as the District of Columbia, a full time well paid Commissioner, because of the important character of his responsibilities, and most certainly, as a corollary, a sufficient staff, having in mind the responsibilities and duties imposed upon them.