STATE OF NEW JERSEY, BY JOSEPH E. McLEAN, COMMISSIONER OF CONSERVATION AND ECONOMIC DEVELOPMENT, PLAINTIFF-RESPONDENT, v. SILVIO A. LANZA, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued May 20, 1958—Decided June 27, 1958.

520

*Mr. Burrell Ives Humphreys* argued the cause for appellant Silvio A. Lanza.

*Mr. Bernard Hellring,* Special Counsel, argued the cause for the State (*Mr. Philip Lindeman, II,* on the brief; *Mr. David Furman,* Acting Attorney General, attorney).

The opinion of the court was delivered by

HEHER, J. We certified, *sua sponte,* the defendant landowner's appeal to the Appellate Division of the Superior Court from a judgment of the Law Division of the Court appointing commissioners under *R. S.* 20:1–1 *et seq.,* as amended by *L.* 1953, *c.* 20, to assess the damages to be sustained by the taking and condemning by the State of lands and property deemed "appropriate and useful for the future establishment of a water supply system," pursuant to *L.* 1956, *c.* 60, *N. J. S. A.* 58:20–1 *et seq.*

The enabling act, *L.* 1956, *c.* 60, *N. J. S. A.* 58:20–1 *et seq.,* authorizes and directs the Commissioner of Conservation and Economic Development, *section* 1, as amended by *L.* 1957, *c.* 215, effective December 26, 1957, "to acquire, in the name of the State, within 2 years from the effective date of [the] act, such part of the area commonly known as Round Valley, located in Hunterdon county, which in the judgment of the commissioner is appropriate and useful for the future establishment of a water supply system the source of which shall be either the Delaware river, exclusive of its tributaries, or the south branch of the Raritan river or both."

The acquisition of the real property to that end, *section* 2, may be made by purchase or by the exercise of the power of eminent domain according to *R. S.* 20:1–1 *et seq.;* and

real property thus acquired, *section* 4, as amended by *L.* 1957, *c.* 215, "shall be held primarily for use in connection with a water supply system the source of which shall be either the Delaware river, exclusive of its tributaries, or the south branch of the Raritan river or both, but shall also be made available, as a State reservation, for recreational and other State uses consistent with its primary use, in accordance. with rules and regulations to be promulgated by the Commissioner of Conservation and Economic Development."

And "[t]o the end that municipalities may not suffer loss of ·taxes by reason of the acquisition and ownership by the State * * * of property therein," it is provided, *section* 5, as amended by *L.* 1957, *c.* 215, that the State Treasurer "upon certification of the Commissioner of Conservation and Economic Development shall pay annually on October 1 to each municipality in which property is acquired pursuant to [the] act (a) a sum equal to that last paid as taxes upon such land for the taxable year immediately prior to the time of its acquisition and (b) in addition, for a period of 13 years beginning with the year 1958 the following amounts: in the first year a sum of money equal to that last paid as taxes upon improvements upon such land for the taxable year immediately prior to the time of its acquisition; and thereafter the following percentages of the amount paid in the first year, to wit, second year 92%; third year 84%; fourth year 76%; fifth year 68%; sixth year 60%; seventh year 52%; eighth year 44%; ninth year 36%; tenth year 28%; eleventh year 20%; twelfth year 12%; thirteenth year 4%."

It is then provided that "All sums of money received by the respective municipalities as compensation for loss of tax revenue pursuant to this section shall be applied to the same purposes as is the tax revenue from the assessment and collection of taxes on real property of the said municipalities, and to accomplish this end such sums shall be apportioned in the same manner as the general tax rate of the municipality for the tax year preceding the year of receipt"; that "The State shall be reimbursed for payments

required to be made by this section out of the proceeds received for the sale of water supplied by said system"; and that the State Treasurer "shall also pay to any county or municipality the cost of relocating any municipal or county roads made necessary by reason of the acquisition or use of property pursuant to [the] act."

And *section* 7 "appropriated" to the Department of Conservation and Economic Development "for the purposes of this act, $3,000,000, or so much thereof as may be needed, from the Veterans Loan Guaranty and Insurance Fund" established pursuant to *L.* 1944, *c.* 126, as amended, "which is in excess of the total amounts of guaranteed or insured loans outstanding now or hereafter as obligations of the Veterans Loan Authority created pursuant" to that chapter.

The complaint alleges that "Plaintiff has determined to acquire" lands of the defendant, therein described by metes and bounds, in fee simple absolute, together with all easements, prescriptive rights and rights of way, "for public use in accordance with the * * * statutory authority vested in him, the said lands and premises being, in the judgment of the Commissioner of Conservation and Economic Development, appropriate and useful for the said statutory purpose," but they are not purchasable by agreement with the owner because of disagreement as to the price.

The answer admits defendant's "unwillingness to sell the lands," denies plaintiff's "right to acquire the same" as not founded on a constitutionally-sufficient statute, and asserts an irregular exercise of the statutory power on the contrary hypothesis.

The defenses were overruled and the commissioners were appointed after a summary hearing at which evidence was adduced; and the Appellate Division restrained the taking of possession until the determination of the appeal now before us.

The commissioners have made their report; and defendant's appeal from the award is now pending in the Superior Court.

# I.

The primary point made is that the Round Valley Act of 1956, *N. J. S. A.* 58:20–1 *et seq.,* "creates a debt or liability of the State to certain municipalities and counties without submitting the question to the voters as required" by *Art.* VIII, *Sec.* II, *par.* 3 of the 1947 *State Constitution.*

It is said in argument that the constitutional interdict is against "the creation of any debt or liability 'in any manner' if it together with previous debts or liabilities exceeds 1% of the total appropriation for any given year unless the same be authorized by the voters"; and that the statute "obligated the State to pay certain municipalities an amount equal to the taxes lost as a result of the condemnation and to pay to counties and municipalities the cost of relocating any municipal or county roads." *McCutcheon v. State Building Authority,* 13 *N. J.* 46 (1953), and *Behnke v. New Jersey Highway Authority,* 13 *N. J.* 14, 28 (1953), are deemed conclusive of the issue.

But the Legislature has not thereby, in any manner, created "a debt or debts, liability or liabilities of the State" for the purchase price of the real property found essential to the consummation of the project, nor did it intend so to do; it has merely made provision for the replacement of the local tax losses, and the payment of the cost of relocating municipal or county roads made necessary by "the acquisition or use of property" pursuant to the act, all attending the fulfillment of an undertaking in the interest of the general health and welfare, the "payments required" by that "section" to be eventually reimbursed from the proceeds of the sale of water thereby to be supplied, and thus it is an inherently voluntary subsidiary measure to avert economic crisis in the functioning of its own local subdivisions of government as a direct result of its own action for the common good of its inhabitants in a critical area of state responsibility, the basic object of the legislation. It was a secondary or minor means of warding off undue hardship and failure in local administration of government by its own agencies that would other-

wise be an incident of a course taken to meet a great necessity of the people as a whole. The losses thus reimbursed have no direct relation to the compensation to be made for the real property to be acquired for the service of the general current and reasonably foreseeable needs. $3,000,000 was appropriated by the act for that purpose. And, moreover, the recompense thus provided for the loss of tax revenue shall be applied "to the same purposes as is the tax revenue" from the assessment and collection of taxes on real property of the particular municipality, and "apportioned in the same manner as the general tax rate" of the municipality "for the tax year preceding the year of receipt," a course of action in which the State is directly interested. And the direction to the State Treasurer to pay the cost of road relocations to the county or municipality, presumably from available moneys in the Treasury, involves voluntary payments of the same character to the same end. In this context, for the purposes of the instant case, there is no essential or qualitative difference between the reimbursement of tax revenue losses and the payment of the cost of relocating local roads.

Neither of these provisions gives rise to a "debt" or "liability" within the intendment of the constitutional limitation as interpreted and applied in *McCutcheon* and *Behnke*. There is no bargain or professed contractual, conventional or legal undertaking to recompense the given loss of tax revenue, but rather a truly "voluntary appropriation" for a "lawful object" according to the distinction made in *Wilson, Attorney General v. State Water Supply Commission,* 84 *N. J. Eq.* 150 (*E. & A.* 1915), and *City of Passaic v. Consolidated Police and Firemen's Pension Fund Commission,* 18 *N. J.* 137 (1955). In *Wilson,* Mr. Justice Garrison said of the then constitutional limitation, 1844 *Constitution, Art* IV, *Sec.* VI, *par.* 4, in terms much the same as its 1947 counterpart, that the interdiction is against the "construction of such debts" and not against "voluntary appropriations for any lawful object." In *Passaic,* Chief Justice Vanderbilt, speaking for a unanimous court, had this to say of a like argument directed to the provision of the act "requiring the State to

contribute" to the consolidated police and firemen's pension, under the control of a State Commission, *L.* 1952, *c.* 358, *N. J. S. A.* 43:16–5: "No debt has been created here, but rather present legislation merely provides that the State shall annually contribute to the fund." And the same. is equally true of the measure for relief from the economic burden of road relocation.

Of course, the constitutional debt-limitation provision is not confined in quality and scope to debts or liabilities enforceable by action, a contradiction in terms, so applied. Here, the Legislature merely undertook to supply the tax revenue loss out of the sale of the water product of the realized facility, meanwhile by essentially voluntary annual appropriations to continue local governmental function and operation through its own subordinate political divisions, just as much so as in the case of other subventions by the State to its agencies for local government and municipal administration. In *McCutcheon* and *Behnke,* the "debts" and "liabilities" would consist of bonds to be sold and the "use" and "loaning" of the State's credit for the creation of the required capital fund, radically different transactions involving "moral and ethical compulsions," such as might be deemed to arise out of the undertaking itself.

Here, the municipalities have no proprietary interest in the lands; and they have no special concern in the realization of this program for the general and common use of the State's inhabitants, nor are they parties to the proceeding to that end. They are political subdivisions or departments of the State for local self-government; and their relations *inter se* are to be treated accordingly. *City of Jersey City v. Martin,* 126 *N. J. L.* 353 (*E. & A.* 1941); *City of Trenton v. State of New Jersey,* 262 *U. S.* 182, 43 *S. Ct.* 534, 67 *L. Ed.* 937 (1922).

Such are the differentiating elements in assessing the basic quality of the constitutional limitation.

And the immunity of the property of the State and of its political subdivisions from taxation does not come from the want of legislative power to subject such property

to taxation. "The state may, if it sees fit, subject its property, and the property owned by its municipal divisions, to taxation, in common with other property within its territory." *Trustees for Support of Public Schools v. Inhabitants of City of Trenton*, 30 *N. J. Eq.* 667, 681 (*E. & A.* 1879). See *R. S.* 54:4–3.3, as amended by *L.* 1950, *c.* 269; also *Jamouneau v. Division of Tax Appeals*, 2 *N. J.* 325 (1949).

■ The Constitution derives its force, not from the Convention which framed it, but from the people who ratified it; and the intent to be arrived at is that of the people. Hence, we inquire as to the meaning the symbols of expression would most naturally and plainly convey, the sense most obvious to the common understanding, that is to say, the reason and spirit which giveth life to the law, and not the letter which killeth. And implication is a vital element of the interpretive process. That which may reasonably be implied is as much a part of the instrument as that which is stated in terms—an intention apparent in the writing and therefore an integral part of the expression itself. *Gangemi v. Berry*, 25 *N. J.* 1 (1957).

■ Moreover, were it infected with the vice thus attributed to it, this statutory provision would be severable and the statute would stand otherwise. There is no severability clause here; but that is not *ipso facto* conclusive. The principle of separability is in aid of the intention of the lawgiver. The essential inquiry is whether the lawmaking body designed that the enactment should stand or fall as a unitary whole. It is not enough that the act be severable in fact; its severability in the event of partial invalidity must also have been within the legislative intention. It is a question of interpretation and of legislative intent whether the particular provision is so interwoven with the invalid clauses as that it cannot stand alone. A severability clause "provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command." *Dorchy v. State of Kansas*, 264 *U. S.* 286, 44 *S. Ct.* 323, 68 *L. Ed.* 686 (1924). Even

where a severability clause has reversed the presumption of an intent that unless the act operate as an entirety it shall be wholly ineffective, the void provisions may "so affect the dominant aim of the whole statute as to carry it down with them." *Railroad Retirement Board v. Alton R. Co.,* 295 *U. S.* 330, 55 *S. Ct.* 758, 768, 79 *L. Ed.* 1468 (1934). And compare *Riccio v. Hoboken,* 69 *N. J. L.* 649 (*E. & A.* 1903) ; *United States v. Reese,* 92 *U. S.* 214, 23 *L. Ed.* 563 (1875) ; *United States v. Steffens,* 100 *U. S.* 82, 25 *L. Ed.* 550 (1879—Trade-Mark Cases).

And, by the same reasoning, even if there be no such express declaration of separability, an unconstitutional provision in a statute does not affect the validity of a separate article or clause of the enactment, if otherwise valid, unless the two are so intimately connected and mutually dependent as reasonably to sustain the hypothesis that the Legislature would not have adopted the one without the other. Where the principal object of the statute is constitutional, and the objectionable provision can be excised without substantial impairment of the general purpose, the statute is operative except insofar as it may contravene fundamental law. And the question is to be considered in the light of the settled principle that a permissible doubt as to validity is to be resolved in favor of the enactment. *St. John The Baptist Greek Catholic Church of Perth Amboy v. Gengor,* 121 *N. J. Eq.* 349 (*E. & A.* 1937). See *State v. Doto,* 10 *N. J.* 318 (1952) ; *Angermeier v. Borough of Sea Girt,* 27 *N. J.* 298 (1958).

So assessed, the challenged provisions for the relief of the municipalities from the consequence of the tax revenue loss and road relocation would be separable were they for any reason ineffective; and the statute would not thereby be otherwise impaired.

## II.

But it is urged that the Legislature, by this course, "unconstitutionally delegated its legislative powers to an ad-

ministrative official," in that the Round Valley Act "does not establish nor purport to establish a Water Supply System for the State," and it is left to the Commissioner to "make the following determinations": (a) "decide what is Round Valley," which "has no definite boundary on at least one side"; (b) "decide what parts are appropriate and useful for the *future* establishment of a Water Supply System or Systems confined to the Delaware River"; (c) "decide what parts of this area would be 'appropriate' or 'useful' for a future 'Water Supply System' "—"what is the future 'Water Supply System,' " its "location," "who will be its users," the location of the "pipes, mains, pumping stations and connections"; and what "its extent" is to be, the particular point being that if "such system is to serve local communities only, a much smaller area of land will be 'appropriate and useful' than if it is to serve a major portion, or the whole, of the state."

In sum, the argument is that the Commissioner "must determine the requirements of a Water System of unknown extent and location; he must then determine what lands in an area are 'appropriate and useful' for such a system"; and he "must do all this although the Legislature has not made up its mind on these questions."

All these, it is said, are "questions to be determined by the Legislature"; there was at the time of the Commissioner's determination "no existing or presently contemplated Water Supply System"; the statute "is completely devoid of necessary standards"; and the "delegation of power here is delegation run amok."

██ "Eminent domain" is the power of the State to take private property for public use, for which "just compensation" must be made in virtue of the 1947 *State Constitution, Art. I, par.* 20, and the Fourteenth Amendment to the Federal Constitution. It is a right founded in the law of necessity which is inherent in sovereignty and essential to the existence of all government, even in its most primitive forms, a right exercised by the Romans, whence came the term "eminent domain," in the construction of roads, aque-

ducts and similar public works. *State of Georgia v. City of Chattanooga,* 264 *U. S.* 472, 44 *S. Ct.* 369, 68 *L. Ed.* 796 (1923); *Pollard v. Hagan,* 3 *How.* 212, 11 *L. Ed.* 565 (1845); *Scott v. City of Toledo,* 36 *F.* 385, 1 *L. R. A.* 688 (*Cir. Ct.* 1888); *Western Union Tel. Co. of Illinois v. Louisville & N. R. Co.,* 270 *Ill.* 399, 110 *N. E.* 583 (*Sup. Ct.* 1915); *George v. Consolidated Lighting Co.,* 87 *Vt.* 411, 89 *A.* 635, 52 *L. R. A., N. S.,* 850 (*Sup. Ct.* 1914).

The constitutional provision is not the source, but rather a limitation upon the exercise of this attribute of sovereignty; and it would seem to be basic to this conception that "when the use to which the property taken is applied is public, the propriety or expediency of the appropriation cannot be called in question by any other authority." *United States v. Jones,* 109 *U. S.* 513, 518, 3 *S. Ct.* 346, 27 *L. Ed.* 1015 (1883); *City of Cincinnati v. Louisville & N. R. Co.,* 223 *U. S.* 390, 32 *S. Ct.* 267, 56 *L. Ed.* 481 (1911). And see *Abbott v. Beth Israel Cemetery Ass'n. of Woodbridge,* 13 *N. J.* 528, 543 (1953).

The exercise of the State's sovereign power is the exclusive province of the legislative branch of the government; and, since the Legislature cannot in all cases directly supervise the taking of property by eminent domain, it may delegate the exercise of the right. It is for the Legislature to determine what constitutes a public use, a finding beyond judicial interference unless it be unreasonable and arbitrary and a perversion of the power. Compare *Albright v. Sussex County Lake and Park Commission,* 71 *N. J. L.* 303 (*E. & A.* 1904).

Here, the public use was found by the Legislature and the delegation to the Commissioner of authority to acquire lands for the given purpose, either by purchase or by the exercise of the power of eminent domain, was expressed in terms certain and definite for the fulfillment of the declared imperative need.

The preamble recites the "long recognized" need for "additional supplies of water" to meet "the future requirements of the people of the State"; the making of "various pro-

posals * * * for the creation of new water supply systems" to serve the need, "in particular, the projects for the establishment of a water supply system to be known as the Round Valley Water Supply System, for the use of the Delaware river waters"; and the legislative finding that it "is advisable to authorize the acquisition of certain real property which will be needed for additional water supply systems, without awaiting the enactment into law of such statutes as may be necessary to specifically create and establish new and additional water supply systems." And to effectuate this legislative plan as a means of meeting a great public necessity, the Commissioner was authorized and directed to acquire, within two years, "such part of the area [in Hunterdon County] commonly known as Round Valley" as, in his judgment, "is appropriate and useful" for the establishment of a water system having the given source, to be available also for "recreational and other State uses" consistent with the primary use.

The Round Valley area had been chosen for the purpose by the Legislature itself, after long public discussion and debate and consultation with engineering specialists; its geographical identity is commonly known; and the Commissioner was delegated to acquire the land, such as would be "appropriate and useful" for the defined primary and secondary projects. There was no undue delegation of legislative power in this proceeding; the Commissioner's authority is administrative, that is to say, the execution of the declared legislative will according to a definite and certain policy and rule of action. Compare *City of Newark v. New Jersey Turnpike Authority*, 7 *N. J.* 377 (1951); *Burnett v. Abbott*, 14 *N. J.* 291 (1954); *New Jersey Turnpike Authority v. Washington Township*, 16 *N. J.* 38 (1954); *City of Trenton v. Lenzner*, 16 *N. J.* 465 (1954); *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504 (*E. & A.* 1935); *Olmsted v. Proprietors of the Morris Aqueduct*, 47 *N. J. L.* 311 (*E. & A.* 1885); *Tennessee Gas Transmission Co. v. Hirschfield*, 38 *N. J. Super.* 132 (*App. Div.* 1955). And see *United States v. Carmack*, 329 *U. S.*

230, 67 *S. Ct.* 252, 91 *L. Ed.* 209 (1946); *Joslin Mfg. Co. v. City of Providence,* 262 *U. S.* 668, 43 *S. Ct.* 684, 67 *L. Ed.* 1167 (1922).

### III.

But it is insisted that the landowner was precluded "from cross-examining the Commissioner with respect to his determination that the lands condemned were appropriate and useful for the purposes set forth in the Round Valley Act."

Conceding that "to prove the taking wrongful" in this regard, he must demonstrate "improper motives, bad faith or some other consideration amounting to a manifest abuse of the power of eminent domain," citing *Tennessee Gas Transmission Co. v. Hirschfield, supra,* and that he does not charge the Commissioner "with improper motives, or manifest abuse of discretion with regard to his taking" of the lands in question *"as a matter of location,"* the landowner nevertheless urges that he should have been afforded an opportunity to prove that Round Valley is not "appropriate and useful" for the purposes of the act "for, among other reasons, the lack of Delaware River water," and that the Commissioner "therefore did not make such a determination, or if he did, he manifestly abused his discretion."

The suitability of the Round Valley area for the proposed water supply system was established by the judgment of the Legislature itself; and the Commissioner was directed to acquire "such part of the area" as in his judgment "is appropriate and useful" for a water supply system having its source in the Delaware River exclusive of its tributaries, later expanded by *L.* 1957, *c.* 215, to include the Raritan River as a source of supply.

The point is not made that the water supply from these sources is so lacking in volume as to render the lands inappropriate and useless for the fulfillment of the legislative object and policy. Indeed, it is said that, in view of the supplemental source provided by the act of 1957, the Commissioner "should now render a new determination and the

defendant should have an opportunity to cross-examine the Commissioner on the appropriateness and usefulness of this new determination."

Commissioner McLean was cross-examined at length; and at the conclusion of the examination, counsel for the landowner announced that he would not call "any witnesses"; that his "sole purpose was to obtain the evidence upon which the Commissioner made his judgment," and "[h]e says we have it here; that's all I need." The Commissioner and his administrative assistants and specialists produced technical data, maps, reports and surveys which had entered into his determination; and they were made available to defendant's counsel for use on cross-examination.

The question overruled, addressed to the Commissioner, was whether the "Tams Report" "mention[s] the fact" that New Jersey "can at present only divert 100 million gallons of Delaware water from the Delaware River for use outside the Delaware Watershed." Judge Hall deemed it to be irrelevant to the judicial inquiry "whether this is a good place for a reservoir," and "whether they can get enough water to fill it from the Delaware."

■■■ We hold that the Commissioner's determination constitutes a fair and just assessment of the facts related to the legislative judgment he was directed to fulfill, in no sense unreasonable, capricious, or arbitrary; and that the refusal to receive the content of the Tams Report in the particular indicated was not prejudicial to the landowner. And this, without regard to the later expansion of the water source. The point made is basically in derogation of the legislative judgment; the Commissioner has not exceeded the need found by the Legislature.

## IV.

■■■ *A.* And it is contended that the action here "was maintained contrary to the provisions of the Round Valley Act," in the employment of "special counsel" to "prosecute [the] action."

The reasoning is that the Round Valley Act provides, *section* 3, *N. J. S. A.* 58:20-3, that in the event of condemnation proceedings, "the Attorney-General shall represent the State and the Commissioner" and, *section* 6, no part of the funds thereby appropriated shall be used for any purpose other than for payment of the cost of acquisition of real property by purchase or condemnation, and the cost of title examination and expert appraisals and testimony; that *L.* 1944, *c.* 20, *N. J. S. A.* 52:17A-13 forbids the employment of "special counsel" save as therein provided; and that the Legislature did not intend that "an action be brought contrary to their direction as to the use of public funds."

But the action was instituted and is maintained by the Attorney General, acting by special counsel appointed by him with the approval of the Governor. And the validity of the special counsel's employment and his right to compensation are collateral issues not relevant to this inquiry. Compare *State v. Bolitho,* 103 *N. J. L.* 246 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 446 (*E. & A.* 1927). And see *Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433 (1952).

 *B.* Finally, it is said that the Legislature "appropriated funds for the purposes set forth in the Round Valley Act in violation" of the 1947 *Constitution, Art.* VIII, *Sec.* II, *par.* 2, "since the Governor did not certify as required by the Constitution" that there were "sufficient funds on hand and anticipated for this appropriation."

There was no proof below that the Governor had not certified that sufficient funds were on hand to sustain the appropriation made here; the appropriation was made, not from funds in the State Treasury, but from excess funds in the Veterans Loan Guaranty Fund, *L.* 1944, *c.* 126, as amended by *L.* 1946, *c.* 121, *N. J. S. A.* 38:23B-5; the landowner raised the point but did not undertake to prove it; the Attorney General calls attention to the Governor's Budget Message of January 31, 1955, for the fiscal year ending June 30, 1956, showing that there would be an estimated balance in the Veterans Fund on June 30, 1956, over

and above all estimated expenses and reserves, of approximately \$9,000,000. The landowner can take nothing by this point.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, FRANCIS and PROCTOR—6.

*For reversal*—None.