NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5152-15T1

NEW JERSEY SPORTS AND
EXPOSITION AUTHORITY,

 Plaintiff-Respondent,

v.

TOWN OF KEARNY,

 Defendant-Appellant,

and

STATE OF NEW JERSEY, by and through
the TIDELANDS RESOURCE COUNCIL,
THEODORE C. WILDMAN, and all of
his heirs, successors and assigns,
MIMI DEVELOPMENT CORPORATION, its
successor HUDSON MEADOWS URBAN
RENEWAL DEVELOPMENT CORPORATION,
and its further successor, SONEE
URBAN RENEWAL CORPORATION,

 Defendants.

 Submitted October 11, 2017 — Decided November 20, 2017

 Before Judges Fuentes, Koblitz, and Manahan.

 On appeal from the Superior Court of New
 Jersey, Law Division, Hudson County, Docket
 No. L-2039-16.
 Castano Quigley LLC, attorneys for appellant
 (Gregory J. Castano Jr., on the brief).

 Lowenstein Sandler LLP, attorneys for
 respondent (James Stewart and Rachel Warren,
 on the brief).

 PER CURIAM

 Appellant Town of Kearny (Kearny) appeals from an order

denying its motion for summary judgment and from an order granting

a final judgment authorizing the New Jersey Sports and Exposition

Authority (NJSEA) to exercise its power of eminent domain relating

to the Keegan Landfill.

 Kearny raises the following points on appeal:

 POINT I

 WHETHER THE CONDEMNATION VIOLATES THE
 CONTRACTS CLAUSE OF THE UNITED STATES
 CONSTITUTION.

 POINT II

 WHETHER NJSEA'S CONDEMNATION OF THE KEEGAN
 LANDFILL WAS BROUGHT IN BAD FAITH.

 POINT III

 WHETHER NJSEA DID NOT "TURN SQUARE CORNERS"
 WHEN IT CONDEMNED THE KEEGAN LANDFILL.

 POINT IV

 WHETHER THE NJSEA IS ESTOPPED FROM USING
 EMINENT DOMAIN TO AVOID ITS CONTRACTUAL
 OBLIGATIONS BECAUSE OF ALLEGED INDUCEMENTS
 MADE BY NJMC PRIOR TO THE EXECUTION OF THE
 LEASE AGREEMENT.

 2 A-5152-15T1
 Having considered these arguments in light of the record and

controlling law, we affirm substantially for the reasons set forth

in the comprehensive, well-reasoned thirty-three page written

opinion of Judge Peter F. Bariso, Jr. We add the following.

 NJSEA is the zoning and planning agency for the Hackensack

region. In February 2015, NJSEA and the New Jersey Meadowlands

Commission (NJMC) merged and became collectively known as NJSEA.

N.J.S.A. 5:10A-1 to -68. NJSEA is authorized to acquire any real

property within its jurisdiction if the commission finds it

necessary or convenient to do so for any of its authorized

purposes, including temporary purposes, in accordance with the

Eminent Domain Act of 1971. N.J.S.A. 20:3-1 to -50. One of

NJSEA'S authorized purposes is to "provide solid waste disposal

and recycling facilities for the treatment of solid waste."

N.J.S.A. 5:10A-7(k).

 The Keegan Landfill consists of approximately 110 acres

located northeast of Bergen Avenue in Kearny. The majority of the

disposal activity occurred at this site during the 1960s and 70s.

The landfill was not properly remediated, and contaminated

leachate regularly discharged into the adjacent fresh water marsh,

resulting in underground fires.

 According to the appraisal report dated March 16, 2016, the

estimated market value of the fee simple interest in the Keegan

 3 A-5152-15T1
Landfill is $1,880,000. By letter dated May 3, 2016, NJSEA offered

to purchase the landfill from Kearny for the market value.

 On January 11, 2005, a special public meeting was held in

Kearny Town Hall Council Chambers to discuss the future of the

Keegan Landfill. The meeting included Kearny's mayor and council,

and representatives of the NJMC. The NJMC representatives outlined

their plan to temporarily re-open and remediate the landfill. NJMC

also declared its intention to return the landfill property at the

end of the lease term to Kearny for use as a potential recreational

area. Additionally, NJMC would provide a funded escrow account

for Kearny to use post-closure.

 Following the meeting, NJMC and Kearny jointly drafted and

mailed to all Kearny residents a promotional piece entitled "The

Kearny-NJMC Green Space Initiative." The goal of the initiative

was described as "a comprehensive plan to remediate the

contaminated Keegan Landfill in Kearny, repair flood-control

waterways east of Schuyler Avenue, restore the Kearny Marsh and

construct additional parks and recreation sites for residents."

 4 A-5152-15T1
 On June 14, 2005, Kearny and NJMC executed a lease agreement

to implement the Green Space Initiative.1 The lease, in pertinent

part, recited:

 WHEREAS, [NJSEA] intends to fund the landfill
 closure (and the remediation of the adjacent
 Kearny Marsh owned by [NJSEA]) through
 revenues generated by disposal of Type 13
 construction and demolition waste and Type 27
 industrial waste (but not including asbestos
 or chemical waste) at the Keegan Landfill; and

 . . . .

 WHEREAS, as part of this project the [NJSEA]
 will assume sole responsibility, without
 financial assistance or contribution from
 Kearny, for the design and implementation of
 a closure plan approved by the Department of
 Environmental Protection [NJDEP]; and

 WHEREAS, upon completion of operations and
 closure of the Keegan Landfill, [Kearny] shall
 undertake the installation of recreational
 facilities on the demised premises, which
 shall incorporate, to the extent practicable,
 the requirements of N.J.A.C. 7:2A-9 for
 grading and final cover; and

 WHEREAS, the [NJSEA] shall, upon the
 completion of operations and closure of the
 Keegan Landfill, convey to [Kearny] the
 closure escrow account it has established in
 accordance with N.J.A.C. 7:26-2A.9, at which
 time [Kearny] shall assume sole responsibility
 for all post-closure requirements for the
 Keegan Landfill pursuant to that rule;

 . . . .

1
 The lease was amended on June 15, 2005, to revise the schedule
for the payment of fixed rent in favor of Kearny, in exchange for
which Kearny agreed to a six-month extension of the lease term.

 5 A-5152-15T1
 After the cessation of Disposal Operations at
 the Keegan Landfill, the [NJSEA] shall pay to
 [Kearny] the funds described in Section 7B,
 on the condition that [Kearny] shall use this
 money to fund the installation of recreational
 facilities at the Demised Premises and the
 Retained Premises.

 . . . .

 No Costs to Town. It is the intention of the
 parties that [Kearny] shall have no expenses
 whatsoever with respect to the Demised
 Premises or the Retained Premises during the
 Lease term and the [NJSEA] agrees that it will
 provide, at its sole cost and expense, for the
 closure of the Keegan Landfill.

 . . . .

 At the end of Disposal Operations and the
 completion of closure, the [NJSEA] shall
 transfer to [Kearny] the post-closure escrow
 account created in accordance with the
 requirements of N.J.S.A. 13:1E-109 and
 N.J.A.C. 7:26-2A.9(g), and [Kearny] shall
 accept the account and assume sole
 responsibility to perform the required post-
 closure activities at both the Demised
 Premises and the Retained Properties.

 . . . .

 The [NJSEA] shall on the last day of the Term,
 peaceably and quietly surrender the Demised
 Premises to [Kearny].

 In December 2006, NJMC published a comprehensive action plan

containing statements related to the re-opening of the property.

The plan stated that "[a]fter the full closure of [the Keegan

Landfill] in 2013, the [NJSEA] will have completed its shift from

 6 A-5152-15T1
operating and closing landfills to reusing them." The plan also

stated that it "include[s] closure costs of the landfill and post-

closure costs to convert the landfill to a nature park or a golf

course in 2013."

 One year later, NJMC authored a "Closure/Post[-]Closure

Financial Plan" for the Keegan Landfill that stated, "[t]he purpose

of reopening this former landfill is to allow the collection of

tipping fees to obtain the necessary funding to properly remediate

(close) the site in accordance with NJDEP regulations." In July

2008, NJMC authored a "Closure and Post-Closure Care Plan" for the

Keegan Landfill that stated, "[a]fter closure, the Keegan site

will be returned to [Kearny]. It is anticipated that the site

will remain as passive open space." The plan further stated that

"[u]ltimately, as the site will return to [Kearny], the final long

term end use will be determined by [Kearny]." Five months later,

NJMC reopened the Keegan Landfill under a Temporary Certificate

of Authority to Operate issued by NJDEP.

 According to the certification of Thomas Marturano, the

Director of Solid Waste and Natural Resources at NJSEA, beginning

in 2014, NJSEA determined that it was in the public interest to

extend the operating life of the Keegan Landfill and commenced

negotiations to extend the lease agreement with Kearny. In a

letter dated June 9, 2015, NJSEA requested that Kearny complete

 7 A-5152-15T1
negotiations for the continued operation of the Keegan Landfill.

Additionally, NJSEA addressed Kearny's alleged obligation to fund

post-closure activities.

 The parties continued negotiations and exchanged

correspondence on July 24 and July 30, 2015, without reaching an

accord. By letter dated September 18, 2015, NJDEP advised the

parties that absent a new lease or extension that allows continued

operation of the landfill, NJSEA and Kearny would be required to

begin preparations for termination of operations and

implementation of closure of the landfill in the near future.

Further, the parties were advised that without a complete

application for renewal at least ninety days prior to the

expiration date, NJSEA must terminate the receipt of waste on or

prior to June 20, 2016.

 In February 2016, the Kearny Town Council adopted a resolution

authorizing the issuance of a Notice to Quit/Demand for Possession

and Compliance Lease Obligations. Kearny's counsel subsequently

sent the notice via email and overnight mail to NJSEA.

 On March 17, 2016, NJSEA adopted Resolution 2016-10, which

authorized the use of eminent domain to acquire the underlying

property. By letter dated May 3, 2016, NJSEA made Kearny a pre-

condemnation offer to acquire the Keegan Landfill for $1,880,000.

 8 A-5152-15T1
Two weeks later, Kearny responded to NJSEA's pre-condemnation

offer by urging NJSEA to reconsider its use of eminent domain.

 On May 19, 2016, NJSEA filed a verified condemnation complaint

with the trial court. Five days later, the court entered an order

to show cause and an order for deposit. In lieu of an answer,

Kearny filed a motion for summary judgment on June 10, 2016, which

NJSEA opposed. Oral argument was heard on June 24 and July 15,

2016. Two weeks after the conclusion of oral argument, the court

entered an order denying Kearny's motion for summary judgment and

entering a final judgment approving the taking and appointing

condemnation commissioners.

 Two days later, Kearny filed a notice of appeal with this

court followed by a motion for a stay pending appeal, which the

court denied by order dated August 19, 2016. Kearny then filed a

motion for a stay pending appeal to this court, which we denied

on September 23, 2016. Kearny moved to the Supreme Court for a

stay pending appeal two weeks later. The Court denied the stay

on December 6, 2016.

 An appellate court reviews a grant of summary judgment de

novo, using the same standard as the trial court. Turner v. Wong,

363 N.J. Super. 186, 198-99 (App. Div. 2003). Thus, the appellate

court must determine whether a genuine issue of material fact is

present and, if not, evaluate whether the court's ruling on the

 9 A-5152-15T1
law was correct. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307

N.J. Super. 162, 167 (App. Div.), certif. denied, 154 N.J. 608

(1998).

 I.

 We first address the argument that the condemnation action

violated the Contract Clause of the United States Constitution.

Under the United States and New Jersey Constitutions, a government

body is permitted to take private property for public use in

exchange for just compensation. U.S. Const. amend. XIV § 2; N.J.

Const., art. I, ¶ 20. "Eminent domain is the power of the State

to take private property for public use. . . . It is a right

founded on the law of necessity which is inherent in sovereignty

and essential to the existence of government[.]" Twp. of W. Orange

v. 769 Assocs., LLC, 172 N.J. 564, 571 (2002). Although the power

of eminent domain is held exclusively in the legislative branch

of the government, various state agencies have been given the

authority by the State Legislature to condemn private property for

just compensation because it is not feasible for the Legislature

to directly oversee all condemnation actions. Wes Outdoor

Advertising Co. v. Goldberg, 55 N.J. 347, 351 (1970).

 Here, Kearny argues that NJSEA's exercise of eminent domain

to condemn the Keegan Landfill violated the Contract Clause of the

United States Constitution. Kearny states that "the state

 10 A-5152-15T1
government does not have free reign to simply disregard its pre-

existing contractual obligation, even if needed to satisfy an

'important public interest.'"

 In United States Trust Company v. New Jersey, a case that

both Kearny and NJSEA cite in support of their respective

arguments, the Court held that the Contract Clause "limits

otherwise legitimate exercises of state legislative authority, and

the existence of an important public interest is not always

sufficient to overcome that limitation." 431 U.S. 1, 21, 97 S.

Ct. 1505, 1517, 52 L. Ed. 2d 92, 109 (1977). The Court also held

that "the Contract Clause does not require a State to adhere to a

contract that surrenders an essential attribute of its

sovereignty." Id. at 23. The Court further held that a state's

police power and a state's eminent domain power are examples of

these essential attributes of sovereignty that cannot be

"contracted away." Id. at 24.

 NJSEA is authorized to acquire by eminent domain any real

property within its jurisdiction if NJSEA determines it necessary

or convenient to do so for any of its authorized purposes.

N.J.S.A. 5:10-29; N.J.S.A. 5:10-5(m); N.J.S.A. 13:17-6(g). One

of NJSEA's authorized purposes is to provide solid waste disposal

and recycling facilities for the treatment of solid waste.

N.J.S.A. 5:10A-7(k).

 11 A-5152-15T1
 In 2014, NJSEA determined that NJSEA'S continued operation

of the Keegan Landfill served as a vital public function that was

in the public interest. After failing to negotiate an extension

of the lease agreement with Kearny, and after Kearny sent NJSEA a

"Notice to Quit/Demand for Possession and Compliance with Lease

Obligations," NJSEA decided that it needed to use its eminent

domain power to ensure continued operation of the landfill.

 In reaching this decision, Judge Bariso held, and we agree,

NJSEA did not violate the Contract Clause as it was duly authorized

to use eminent domain to condemn the landfill; it exercised that

authority in furtherance of one of its stated purposes; and eminent

domain is an essential attribute of state sovereignty that cannot

be contracted away.

 II.

 We next address the bad faith argument. A reviewing court

"will not upset a municipality's decision to use its eminent domain

power 'in the absence of an affirmative showing of fraud, bad

faith or manifest abuse.'" Twp. of W. Orange, supra, 172 N.J. at

571 (quoting City of Trenton v. Lenzner, 16 N.J. 465, 473, cert.

denied, 348 U.S. 972, 75 S. Ct. 534, 99 L. Ed. 757 (1955)). Great

discretion usually is afforded to condemning authorities in

determining what property may be taken for public purposes. See

Texas E. Transmission Corp. v. Wildlife Preserves, Inc., 48 N.J.

 12 A-5152-15T1
261, 269 (1966) (stating "where the power to condemn exists the

quantity of land to be taken as well as the location is a matter

within the discretion of the condemnor"). Our courts recognize

that it is the responsibility of the Legislature to determine what

constitutes a public use. State v. Lanza, 27 N.J. 516, 530 (1958).

 Bad faith refers to "the doing of an act for a dishonest

purpose" and "contemplates a state of mind affirmatively operating

with a furtive design or some motive of interest or ill will."

Twp. of Readington v. Solberg Aviation Co., 409 N.J. Super. 282,

310-11 (App. Div. 2009). "When considering a claim of bad faith

in the context of an eminent domain action, courts traditionally

distinguish between the motives of the individuals who adopted the

legislation and the purposes of the condemnation itself." Id. at

311. "Courts will generally not inquire into a public body's

motive concerning the necessity of the taking. . . ." Mount Laurel

Twp. v. Mipro Homes, L.L.C., 379 N.J. Super. 358, 375 (App. Div.

2005). Whether a taking is for a public use "is largely a

legislative question beyond the reach of judicial review except

in the most egregious circumstances." Ibid. The burden rests

with the party claiming bad faith to prove the alleged impropriety

by clear and convincing evidence. Twp. of Readington, supra, 409

N.J. Super. at 311.

 13 A-5152-15T1
 Kearny argues that NJSEA's condemnation action was instituted

in bad faith because "it used eminent domain to avoid its pre-

existing contractual obligations." Kearny submits as an example

of bad faith, NJSEA's "gross under-valuation of the property that

disregards its contractual obligation to have paid [Kearny] $3

million for recreational facilities at the end of the lease.

Instead, the NJSEA seeks to pay [Kearny] a mere $1.8 million."

This offer was tendered by the NJSEA predicated upon an appraisal

of the landfill conducted at its behest. The Appraisal Report,

dated March 16, 2016, stated the estimated market value of the fee

simple interest in the Keegan Landfill as $1,880,000.

 NJSEA’s stated reason for institution of condemnation

proceedings was to continue the operation of the landfill in

accordance with its statutorily authorized purpose of providing

solid waste disposal. NJSEA determined that it would be in the

public interest to continue its operation of the landfill and,

consistent therewith, commenced negotiations with Kearny to extend

the lease agreement. NJSEA also took the requisite steps to amend

its Solid Waste Management Plan, which included notice to the

public and a public hearing to receive comments. NJSEA further

engaged in the process of amending its Solid Waste Permit to allow

for the continued operation of the landfill.

 14 A-5152-15T1
 In support of its assertion of bad faith, Kearny has failed

to present any evidence that NJSEA sought to use the landfill for

any purpose other than its continued operation. Nor has Kearny

offered any evidence that NJSEA’s enunciated purpose was pre-

textual. As the burden rested with Kearny to prove bad faith by

clear and convincing evidence of NJSEA’s dishonest or ulterior

purpose, its claim of bad faith failed and Judge Bariso’s rejection

of that claim was proper.

 III.

 Kearny next argues that the judgment authorizing NJSEA's

exercise of eminent domain must be reversed because NJSEA failed

to "turn square corners" when it condemned the Keegan Landfill.

Kearny argues that NJSEA did not "turn square corners" by choosing

to use its powers of eminent domain instead of honoring its pre-

existing contractual obligations. Kearny further argues NJSEA's

exercise of eminent domain was calculated as a method to seek a

"bargaining and litigation advantage" over Kearny. We disagree.

 In dealing with the public, public bodies must "turn square

corners." F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J.

418, 426 (1985). Regarding condemnation, a public body "has an

overriding obligation to deal forthrightly and fairly with

property owners." Ibid. A public body "may not conduct itself

so as to achieve or preserve any kind of bargaining or [litigation]

 15 A-5152-15T1
advantage over the property owner" and "[i]ts primary obligation

is to comport itself with compunction and integrity . . . ." Id.

at 427.

 As noted by Judge Bariso, in condemnation actions, the "turn

square corners" doctrine applies primarily where a public body

seeks to avoid a procedural or pre-litigation requirement, giving

itself a litigation advantage. See Klumpp v. Borough of Avalon,

202 N.J. 390, 413 (2010) (noting that government should provide

additional notice, other than the physical invasion of real

property, to affected property owners before and after a physical

taking); see also Rockaway v. Donofrio, 186 N.J. Super. 344, 354

(App. Div. 1982) (dismissing plaintiff's condemnation of property

for failure to comply with its statutory obligations under N.J.S.A.

20:3-6).

 Kearny does not challenge NJSEA's compliance with any

procedural or pre-litigation requirements of its eminent domain

powers as it is without dispute that NJSEA meticulously complied

with those requirements. As such, Kearny’s "square corners"

argument fails.

 IV.

 Finally, we address the estoppel argument. "Equitable

estoppel is 'rarely invoked against a governmental entity.'"

Middletown Twp. Policemen's Benevolent Ass'n v. Twp. of

 16 A-5152-15T1
Middletown, 162 N.J. 361, 367 (2000) (quoting Wood v. Borough of

Wildwood Crest, 319 N.J. Super. 650, 656 (App. Div. 1999)).

Principles of equitable estoppel "'are relevant in assessing

governmental conduct' and impose a duty on the court to invoke

estoppel when the occasion arises." Middletown, supra, 162 N.J.

at 367. "The essential elements of equitable estoppel are a

knowing and intentional misrepresentation by the party sought to

be estopped under circumstances in which the misrepresentation

would probably induce reliance, and reliance by the party seeking

estoppel to his or her detriment." O'Malley v. Dep't of Energy,

109 N.J. 309, 317 (1987).

 "Equitable estoppel may be invoked against a [public body]

'where interests of justice, morality and common fairness clearly

dictate that course.'" Middletown, supra, 162 N.J. at 367 (quoting

Gruber v. Mayor and Twp. Comm. of Raritan, 39 N.J. 1 (19622)).

Doctrines of estoppel may be applied against the State, but are

not applied "to the same extent as they are against individuals

and private corporations." See Bayonne v. Murphy, 7 N.J. 298, 311

(1951) (the government may not be bound or estopped by unauthorized

acts of its officers when performing certain government

functions).

 Kearny argues that NJSEA is estopped from using its eminent

domain powers because of the statements and publications of NJMC,

 17 A-5152-15T1
NJSEA's predecessor, which were made and published prior to the

execution of the lease agreement. As noted above, these

representations included NJMC's intention to return the property

to Kearny at the end of the lease term for potential recreational

use, and its intention to provide a funded post-closure escrow

account for Kearny's use.

 Kearny also argues that NJSEA's statements during the January

2005 public hearing and the subsequent promotional piece

demonstrate "a deliberate and explicit course of conduct to bait

[Kearny's] elected official and residents into an agreement that

apparently generated substantial revenues that may have been

mismanaged by [NJSEA]. Kearny asserts that common fairness and

equity "dictate that the NJMC and NJSEA be bound by their prior

representations and contract." Again, we disagree.

 Although the condemnation action may be inconsistent with the

goal of the landfill’s takeover as stated by the NJMC in 2005, we

discern no basis to employ estoppel. There is no proof that the

NJMC knowingly or intentionally misrepresented the purpose for re-

opening the landfill, i.e., its remediation. Nor has Kearny

demonstrated reliance on the public statements and the promotional

piece to its detriment. To the contrary, Kearny clearly benefitted

both from the landfill’s remediation and from the substantial

lease payments it received.

 18 A-5152-15T1
Affirmed.

 19 A-5152-15T1